### THE SARNIA.

(Circuit Court of Appeals, Second Circuit. May 22, 1906.)

.No. 225.

1. SEAMEN—INJURIES—TREATMENT.

Where a seaman sustained a trifling injury to his hand, and after being treated by a physician it grew somewhat worse until the next port was reached, where it was again treated by a competent surgeon, who advised that the seaman remain in a hospital, which, however, he did not do, because of his fear of yellow fever, the ship was not liable for its failure to overrule his objection and require him so to remain; the physician having also advised that his injury was not so serious but that he could continue his voyage with comparative safety.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Seamen, §§ 39–44.]

2. SAME—EVIDENCE.

On a libel against a vessel by a seaman for alleged improper treatment of an injury, evidence held insufficient to warrant finding that the vessel's officers were guilty of negligence.

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal from a decree of the District Court, Southern District of New York, in favor of libelant for personal injuries sustained while on a voyage from New York to the West Indies and return in July, 1904. The opinion of the District Judge is reported in 137 Fed. 952.

P. S. Dudley, for appellant.
W. H. Smith, for appellee.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

LACOMBE, Circuit Judge. Before leaving port, while hauling in to shift the vessel from one berth to another, a loose wire of the cable pricked libelant's right hand. No negligence on the part of the ship is charged, so far as the original injury is concerned, but it is contended that he did not receive the subsequent care to which as a seaman he was entitled. The hand gave him no trouble while in the port of New York. He worked just as well as before. But after three days from their sailing it swelled up and pained

him very much. He used oil and bread to put on the swelling and the next day called it to the attention of the first officer and captain. The first officer relieved him of work except at the wheel, and, upon his complaining, of that also; poulticed the hand for a day or two and took off some of the hard skin with a knife. Six days after leaving New York the Sarnia reached Kingston, and the captain at once called in a duly qualified physician, who made an examination, treated the hand with warm antiseptic applications, and the next day made a free incision, and there was a free discharge of pus. He diagnosed the trouble as a "whitlow" and dressed the wound with antiseptic dressing. Greco asked to be left in hospital at Kingston, but the doctor advised the ship's officers that it was unnecessary to leave him in hospital, that he could remain on board and the treatment be carried out there, and that he would probably recover in a week or 10 days. The doctor gave the chief officer instructions as to bathing, care, and dressing of the wound. The next day the vessel sailed for Port Limon, touching at Port Columbus, where there was no doctor, and at Carthaga, where they stayed only four hours. The voyage from Kingston to Port Limon occupied six days, during which time the chief officer attended to his hand every day. The libelant says he "cut it every day." The chief officer says he did not cut it, but took out pus every day as the Kingston doctor had instructed him. Probably the pain of that operation made the plaintiff believe that he was being cut. Greco admits that the first officer "put on some kind of remedy" each day and the mate's statement that he carefully obeyed the doctor's instructions is uncontradicted and inherently probable. It should be noted that this was not merely a rough seaman's effort to follow medical directions. The first officer was certificated under the German law to serve as mate on German steamships. That law required him to study for eight months in a medical school and to pass an examination, all of which he had done. and held certificate thereof.

By the time they reached Port Limon the hand was worse. Greco was at once put in charge of a competent surgeon who saw and treated him twice a day for the four days the ship remained there. The libelant says that he asked to be allowed to remain in hospital there. This is disputed by the ship's officers, and they are corroborated by the entirely disinterested testimony of Dr. Steggall, who says that he at first advised the transfer of the man from the ship to the hospital, but, upon asking the libelant if he would go to the hospital, the latter refused on account of his fear of the Limon climate in midsummer. It is at times afflicted with yellow fever. Thereupon the doctor told the ship's officers that the man could perfectly well go to New York and would receive better treatment when he got there. He also gave the first officer instructions as to treatment to be administered on the voyage home. He testified:

"The libelant's hand showed noticeable improvement during my treatment of same. I used an antiseptic treatment, i. e., lotions and dressings, and I advised the chief officer to administer the same daily during the trip to

New York. The patient needed daily attendance, and I so instructed the officer in question. The hand was suppurating, but not very much. Otherwise I would not have allowed him to go."

He sent bandages, ointment, and some solution on board for use in dressing the hand. That the decision to return to New York was in fact the doctor's seems entirely clear. The captain testified:

"If the doctor saw him four days, every day twice, he must know whether it was necessary to leave him in the hospital, or not. I am not a doctor. I took the doctor's advice. * * * He said if we cleaned the hand every day it would be sufficient for New York."

On the return voyage the Sarnia touched at Kingston for mail and passengers in the middle of the night and reached New York in seven days. The libelant was at once sent to a hospital, when the hand was found to be in very bad condition, the pus having burrowed extensively among the tendons, and the result is that the hand is permanently crippled. As to treatment on the return voyage there is a conflict of testimony. The libelant says the mate medicated his hand only the first day and then abandoned it and left it with the waitress. The chief officer insists that he dressed the hand every day at least once cleansing it and using the materials the doctor had sent, and that the stewardess was present and assisted. There is some indication that on some days she also dressed it a second time. The libelant admits that the stewardess (waitress, he calls her) dressed it every day with "some kind of carbolic acid and put some kind of paste over it"; and says that the paste was all exhausted before they reached New York. Since these are the materials the doctor sent aboard for the purpose, it would certainly seem that the doctor's instructions were carried out.

We are unable to concur in the conclusion that the ship is responsible for the unfortunate result. The District Judge held that the libelant should have been left in the hospital at Kingston in conformity with his request. This seems too severe a rule to apply. The expressed desire of a man with an injury apparently not serious is not to be taken as controlling. The question to be determined was a medical one, the advice of a competent physician was sought and followed, and the ship's officers should not be held negligent because they followed his advice, especially where the injury was of an apparently trifling character. As to leaving him in the hospital at Port Limon, the District Judge says that it is immaterial whether or not the libelant wished to be left there. But this was not a mere matter of preference. It was a choice of evils. When a man injured, even as Greco was, protests against being left unacclimated in midsummer in a yellow-fever port, it is a very serious responsibility to assume to overrule his protest and expose him to what he may reasonably assume to be a deadly peril. Had he been left there and his hand healed quickly, but with the result of bringing him down with an attack of yellow fever, it might well be contended that the master was inhuman in not heeding his protest and bringing him back to the port of shipment, especially since the doctor gave assurance that the voyage might be made without risk to the hand. We are not

inclined to hold the ship liable, because the master, relying on that assurance, acceded to libelant's expressed wish. The District Judge seems to have been of the impression that the libelant was neglected, but the evidence in our opinion does not warrant such a finding. It is said that the first officer discovered the formation of pus only at Port Limon. On the contrary, he discovered it as soon as the doctor opened the swelling at Kingston, and during the six days' voyage to Port Limon tried every day to expel as much pus as he could (the libelant admits this) and followed most carefully the doctor's instructions. The phrase "some treatment was attempted" does not quite accurately describe what was done. The treatment by the chief officer and stewardess is criticized as "useless, so far as any favorable results were concerned." The test of success seems hardly a fair one, so long as they followed the instructions and used the materials and dressings with which the doctor supplied them. It is stated that the chief officer "did not apparently follow the instructions given by the physician at Kingston, but substituted a method of his own which he says he learned at school." There is no evidence to warrant such a finding. He followed the doctor's instructions closely. The witness' use of the word "school" did not import some boyish experimentation, but referred to the school where he received his eight months' medical instruction. We cannot find that Greco was negligently treated by the ship's officers. If the doctors made some error of diagnosis, as the most competent physicians and surgeons sometimes do, and thus prescribed a treatment not sufficient to insure safe return to the United States, the fault should not be charged to those who faithfully administered that treatment.

Undoubtedly a seaman who is injured, even without fault of the ship, should be properly cared for and afforded prompt and competent medical and surgical treatment, so far as the conditions (nearness to port, etc.) may admit. The libelant was relieved from duty, attention was given to him at once, and was continued till port was reached. Both at Kingston and at Port Limon he was at once afforded medical and surgical treatment. The doctors may each have made a serious mistake in this particular case, but certainly they were "competent." The one at Kingston (where claimant has an agency) was the one regularly employed, when necessary, by the American Packet Company. He was a "bachelor of medicine and master of surgery, Edinburgh University 1890," who after three years' clinical work in London, Paris, and Edinburgh, located in Jamaica, where he has been in practice for 11 years. The doctor at Port Limon was graduated from the Royal College of Surgeons of England and the Royal College of Physicians of London in 1892, was two years in the Royal Mail Steam Packet Company's service and then, in 1894, assumed charge of the hospital of the Costa Rica railroad at Port Limon, where he has been ever since. The ship's officers might fairly be entitled to conform their conduct touching any medical or surgical question to the instructions of men thus qualified to decide it.

Reference is made to The Iroquois, 118 Fed. 1005, 55 C. C. A. 497; The Eva B. Hall (D. C.) 114 Fed. 755; The Troop, 128 Fed. 856,

63 C. C. A. 584; and The Svealand, 136 Fed. 109, 69 C. C. A. 97. A perusal of the facts set forth in those cases will show how essentially different is the one at bar. To hold the Sarnia responsible upon the record here presented would be to extend the liability of the ship far beyond the point to which it has been carried in any reported case.

The decree is reversed with costs, and cause remanded with instructions to dismiss the libel.