## DE ZON *v.* AMERICAN PRESIDENT LINES, LTD.

No. 436. Argued February 4, 1943.—Decided April 5, 1943.

*Mr. Herbert Resner* for petitioner.

*Mr. Edward F. Treadwell,* with whom *Mr. Reginald S. Laughlin* was on the brief, for respondent.

MR. JUSTICE JACKSON delivered the opinion of the Court.

Petitioner, a seaman, brought an action at law under the Jones Act[1] against the respondent shipowner. He

___

[1] 41 Stat. 1007, 46 U. S. C. § 688.

alleged that while in the service of its ship he suffered injuries which resulted in the loss of his right eye, because of the negligence of the ship's doctor in treating him and in failing to have him hospitalized ashore. The trial court directed a verdict against him. The Circuit Court of Appeals affirmed for the reason, among others, that the shipowner's duty to the seaman was only to use due care in selecting a competent physician and, that being done, was not responsible for his incompetence or negligence. 129 F. 2d 404. This holding raised an important question of federal law under the Jones Act not passed on heretofore by this Court. Accordingly we granted certiorari. 317 U. S. 617.

The petitioner signed articles as a marine fireman for a voyage, from San Francisco to the Orient and return, on the respondent's passenger ship *President Taft*. The voyage was of about sixty days' duration, ending at the home port on June 10, 1940. On June 3, while petitioner was painting the outside of a boiler, a chip of dry aluminum paint lodged in his right eye, followed probably by getting some of the liquid paint in as well. He went to his quarters and washed the eye with a wash in an eye cup. At this time he did not believe that anything was seriously amiss with his eye, and he returned to work. When he arose the next morning he was suffering considerably from his eye. He told the ship's doctor of this history, and the doctor examined his eye without the aid of any special equipment, washed it out with a boric solution, irrigated it with argyrol, and bandaged it. He told petitioner not to work, and the petitioner repaired to his quarters and stayed there until the ship came into Honolulu, about 4:00 in the afternoon. Then the ship's doctor gave him authority from the master to go ashore for examination at the outpatient department of the Marine Hospital in Honolulu. Petitioner found this closed, and went to Queens Hospital. There he was examined by

Doctor Yap, a physician of unspecified qualifications, who diagnosed the injury as "acute traumatic conjunctivitis" (injury to outer coating of eye resulting from a blow), washed out the eye with a boric acid wash, and applied yellow oxide and an eye pad. Doctor Yap told the petitioner that he could not do much for him, but advised petitioner to get off the ship and be hospitalized ashore. The petitioner returned to the ship, arriving at about 6:00 in the evening. The ship's doctor was ashore, and, since the petitioner did not feel well, the ship's medical orderly put him to bed. Forty minutes before sailing time, the ship's doctor returned. He saw petitioner at 11:30 and was informed of Doctor Yap's recommendation, then told the petitioner that: "Well, if you want to take a chance or a gamble on it you can go on to the States. It don't look so bad. It can be all right." The petitioner answered: "You are the boss; if you want to go, let's go."

The ship sailed at 12:00 midnight on June 4, with petitioner hospitalized aboard. The petitioner's injured right eye got steadily worse, and, in the ship's doctor's term, was in an "alarming" condition two or three days later. The ship's doctor sought the advice of another doctor, a passenger, who had resided in the Orient and was familiar with eye infections common there. He thought that none of these was present, but suggested that petitioner be given sulfapyridine, a drug used to combat eye infections; and this advice was followed. On arrival at San Francisco on June 10, the petitioner was taken to the Marine Hospital by ambulance.

On the evening of June 11, a consulting eye specialist was called in. In the belief that there was a foreign body in the eye he recommended an X-ray, which was made on the next day. Thereafter he reported that the anterior chamber of the eye was filled with dark hemorrhage material, and that in that chamber there was "fibrin . . . or scar of previous operation, most likely the former," with

the comment that "This is a peculiar looking eye which is difficult to fit in with the history of impact with paint scale or possible steel fragment. The hemorrhage suggests perforation with injury to iris or ciliary body. There is small likelihood of a contusion causing it." Petitioner's injury was finally diagnosed on June 15 as "Hemorrhage, anterior chamber, right eye, traumatic." The eye was removed on July 5. In the course of after-treatment there was entered in the hospital records, on September 10, the statement that: "At this time patient changes history of injury and also states he had a muscle operation on right eye in 1937. Injury now alleged to cause the disability was a scale of paint in the eye and it is the opinion of the surgeon in charge that this would give an intraocular hemorrhage such as was present in the right eye. Diagnosis changed September 10, 1940."

Doctor Faed, connected with the Marine Hospital in San Francisco, who had removed the eye, was called as petitioner's witness. He testified that whether an eye injury can be diagnosed as conjunctivitis, as the ship's doctor had diagnosed it, or as a hemorrhage, as was finally the diagnosis at the Marine Hospital, depends upon the doctor and the facilities at his command. He was asked on direct examination whether "if such treatment as was given in the Marine Hospital on June 10th and following had been afforded Mr. De Zon on June 3rd, 4th and following, . . . that might have saved his eye," and answered that "I am unable to give an opinion about that." Then, in response to a question whether, on the basis of the whole history of the case, including that developed at the Marine Hospital at San Francisco, it was his opinion that petitioner "should have been hospitalized on June 3rd and 4th, when this trouble to the eye first occurred," he answered that: "I believe he should have been hospitalized; it might have helped some." He did not wish, however, to "go on record" as saying that it would

have aided, and testified further on direct examination that, not being sure whether to hospitalize petitioner at the earlier date, he "would have given the advantage to the patient." Another and apparently equally well qualified eye specialist, offered as respondent's witness, testified, as did the ship's doctor, that the ship's doctor had given the standard treatment for conjunctivitis, and that additional treatment such as was given the petitioner at San Francisco would have had no beneficial effect, and might have had harmful effects, if given before the period of time which elapsed on the voyage to San Francisco. This specialist also testified, and without contradiction, that it was too much to expect of the ordinary general practitioner, such as the ship's doctor was, to be able to diagnose petitioner's case as a dangerous one.

The testimony of respondent is uncontradicted that the ship's doctor was a duly licensed physician in California, a general practitioner with some surgical experience, and was selected only after careful inquiry had satisfied the Chief Surgeon of the respondent that he was a competent man for the post. It is conceded that proper investigation was made, and it was learned that he was a man of good reputation and character.

Respondent's Chief Surgeon also testified that authority to decide whether a seaman should be treated, and the manner of treatment, was vested in the master, who had authority to disregard any recommendation in this regard that the ship's doctor might make. See also, R. S. § 4596, 46 U. S. C. § 701; R. S. § 4612, 46 U. S. C. § 713.

The Circuit Court of Appeals in considering this case held that the shipowner's duty ended with the exercise of reasonable care to secure a competent general practitioner, and since there could be no question that such care had been exercised, the shipowner could not be held liable in damages for harm that could have followed the negli-

gence of the ship's doctor. In our opinion this was error.

The Jones Act reads in pertinent part as follows: "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; . . ." Thus it makes applicable to seamen injured in the course of their employment the provisions of the Federal Employers' Liability Act, 45 U. S. C. §§ 51–60, which gives to railroad employees a right of recovery for injuries resulting from the negligence of their employer, its agents or employees. *Panama R. Co.* v. *Johnson,* 264 U. S. 375; *The Arizona* v. *Anelich,* 298 U. S. 110; *O'Donnell* v. *Great Lakes Dredge & Dock Co., ante,* p. 36.

*Cortes* v. *Baltimore Insular Line,* 287 U. S. 367, 377–378, explained the effect of the Jones Act as follows: "Congress did not mean that the standards of legal duty must be the same by land and sea. Congress meant no more than this, that the duty must be legal, i. e., imposed by law; that it shall have been imposed for the benefit of the seaman, and for the promotion of his health or safety; and that the negligent omission to fulfill it shall have resulted in damage to his person. When this concurrence of duty, of negligence and of personal injury is made out, the seaman's remedy is to be the same as if a like duty had been imposed by law upon carriers by rail." Recovery was accordingly allowed under the Jones Act for the negligence of the master in the discharge of the ancient duty to provide maintenance and cure for a seaman wounded in the service of the ship.

We are of opinion that the reasoning of the *Cortes* case is controlling, and that there is nothing in this case to shield the shipowner from liability for any negligence of the ship's doctor.

Immunity cannot be rested upon the ground that the medical service was the seaman's and the doctor's business, and the treatment not in pursuance of the doctor's duty to the ship or the ship's duty to the seaman.[2]

---

[2] Liability to a passenger injured by the negligence of a ship's doctor has been denied on this ground. One of the leading cases on liability to passengers is *Laubheim* v. *DeK. N. S. Co.*, 107 N. Y. 228, 13 N. E. 781. It arose before, but was decided after, the enactment of the Act of Congress of August 2, 1882, 22 Stat. 186, 188, 46 U. S. C. § 155, imposing upon ships carrying certain types of passengers the obligation of providing a "competent" doctor for the benefit of the passengers. The plaintiff, a passenger, sued the shipowner for personal injuries resulting from alleged negligence of the ship's surgeon. Judge Francis M. Finch disposed of the case in a short opinion, in the apparent belief that the rule applied was not sufficiently in question to warrant discussion. He said: "If, by law or by choice, the defendant was bound to provide a surgeon for its ships, its duty to the passengers was to select a reasonably competent man for that office, and it is liable only for a neglect of that duty. (*Chapman* v. *Erie R. Co.*, 55 N. Y. 579; *McDonald* v. *Hospital*, 120 Mass. 432; *Secord* v. *St. Paul R. R. Co.*, 18 Fed. Rep. 221.) It is responsible solely for its own negligence and not for that of the surgeon employed." The *Chapman* case tested liability of a railroad by the "fellow servant" doctrine, which has been abolished by the Federal Employers' Liability Act and can therefore have no application in this case. *Jamison* v. *Encarnacion*, 281 U. S. 635. The *Secord* case gives only a charge to a jury in a case where the issue was liability of a railroad to a passenger for negligent treatment by a physician in its employ. The *McDonald* case held a hospital immune from liability for negligence of its house surgeon, on the ground that it was a charitable institution.

*O'Brien* v. *Cunard Steamship Co.*, 154 Mass. 272, 28 N. E. 266, arose under the Act of August 2, 1882, and was decided after the *Laubheim* case, upon which it relied. Judge Knowlton of the Massachusetts Supreme Judicial Court said: "Under this statute it is the duty of ship-owners to provide a competent surgeon, whom the passengers may employ if they choose, in the business of healing their wounds and curing their diseases. The law does not put the business of treating sick passengers into the charge of common carriers, and make them responsible for the proper management of it. The work

"The duty to provide proper medical treatment and attendance for seamen falling ill or suffering injury in the service of the ship has been imposed upon the shipowners by all maritime nations." *The Iroquois,* 194 U. S. 240, 241–242. When the seaman becomes committed to the service of the ship, the maritime law annexes a duty that no private agreement is competent to abrogate, and the ship is committed to the maintenance and cure of the seaman for illness or injury during the period of the voyage, and in some cases for a period thereafter.[3] This duty does not depend upon fault. It is no merely formal obligation and it admits of no merely perfunctory discharge. Its measure depends upon the circumstances of each

which the physician or surgeon does in such cases is under the control of the passengers themselves. It is their business, not the business of the carrier. . . . The master or owners of the ship cannot interfere in the treatment of the medical officer when he attends a passenger. He is not their servant, engaged in their business and subject to their control as to his mode of treatment. They do their whole duty if they employ a duly qualified and competent surgeon and medical practitioner, and supply him with all necessary and proper instruments, medicines, and medical comforts, and have him in readiness for such passengers as choose to employ him. This is the whole requirement of the statute of the United States applicable to such cases. . . ." *Id.* at 275–276.

These statements of judges of great learning, for courts of last resort of states having much to do with maritime pursuits, had their influence upon the federal courts dealing with the same problem. *The Great Northern,* 251 F. 826; *The Korea Maru,* 254 F. 397, 399; *Branch* v. *Compagnie Generale Transatlantique,* 11 F. Supp. 832; cf. *The Napolitan Prince,* 134 F. 159.

[3] The duty is not to "cure" in a literal sense, but to provide care, including nursing and medical attention. *Calmar S. S. Corp.* v. *Taylor,* 303 U. S. 525, 528. It has not been restricted by the Shipowners' Liability Convention of 1936, 54 Stat. 1693, which provides in Article 12 that "Nothing in this Convention shall affect any law, award, custom or agreement between shipowners and seamen which ensures more favourable conditions than those provided by this Convention."

case—the seriousness of the injury or illness and the availability of aid. Although there may be no duty to the seaman to carry a physician, the circumstances may be such as to require reasonable measures to get him to one, as by turning back, putting in to the nearest port although not one of call, hailing a passing ship, or taking other measures of considerable cost in time and money. Failure to furnish such care, even at the cost of a week's delay, has been held by this Court to be a basis for damages. *The Iroquois, supra.*

To provide a ship's physician was therefore no mere act of charity.[4] The doctor in treating the seaman was engaged in the shipowner's business; it was the ship's duty that he was discharging in treating the injured eye. While, no doubt, the physician recognized at least an ethical obligation between himself and the patient, he was performing the service because the ship employed him to do so, not because the petitioner did. He was not an independent practitioner, called to treat one whose expenses the ship agreed to make good. We express no view as to the liability for malpractice by one not in the employ of the ship.[5] But in this case the physician was not in his own or the seaman's control; he was an employee and, as such, subject to the ship discipline and the master's orders.

Whatever, in the absence of the Jones Act, might have been the effect upon respondent's liability of the fact that petitioner and the ship doctor were both in its employ, that Act prevents this fact from conferring an immunity

---

[4] We express no opinion upon whether charitable or gratuitous nature of medical attention should have exculpatory effect. Cf. *President and Directors of Georgetown College* v. *Hughes,* 130 F. 2d 810.

[5] Cf. *The Sarnia,* 147 F. 106; *The C. S. Holmes,* 209 F. 970; *Bonam* v. *Southern Menhaden Corp.,* 284 F. 360 (involving physicians other than ship's doctors).

upon the respondent. *Jamison* v. *Encarnacion,* 281 U. S. 635; *Cortes* v. *Baltimore Insular Line, supra.*

We hold, therefore, that the shipowner was liable in damages for harm suffered as the result of any negligence on the part of the ship's doctor.[6]

We come, then, to the question as to whether there was sufficient proof of negligence to require sending this case to the jury.

The short of the case is that the petitioner failed to disclose the past history of the eye to the ship's doctor, and the ship's doctor diagnosed the case as one of conjunctivitis and gave the petitioner what undisputed medical testimony says to be the standard treatment for that condition. Going ashore, the case was diagnosed similarly by a physician of unstated qualifications, who treated the eye in the same manner as the ship's doctor. Returning to the ship, the petitioner told the ship's doctor of the shore doctor's recommendation that he leave the ship and be hospitalized ashore. The ship's doctor acknowledges that he would have heeded such a recommendation had it been made, but asserts that it was not made. For purposes of testing the correctness of the direction of the verdict, we must assume that the ship's doctor was told of it. The concession of the ship's doctor that he would have heeded such a recommendation is not of itself evidence of negligence. There is not a word of evidence that

---

[6] *Johnson* v. *American Mail Line,* 1937 A. M. C. 1267 (Superior Court for King County, Washington), reached the opposite conclusion, relying upon cases cited in footnotes 2 and 5, *supra,* which we think are inapposite, for the reasons already stated. *Geistlinger* v. *International Mercantile Marine Co.,* 295 F. 176, also denied liability for the ship's doctor's negligent treatment of a seaman, but it did not find the Jones Act applicable, and did not consider what its effect might be if it should be found applicable. *Leone* v. *Booth S. S. Co.,* 232 N. Y. 183, 133 N. E. 439, also denied liability, but it was decided on facts antedating the Jones Act, and it too did not consider the effect of the Act.

the shore doctor was any better qualified to diagnose the eye than was the ship's doctor, and as a matter of fact his diagnosis of the case was the same as the ship's doctor's. That their prognoses were different does not establish either that the one was overly cautious or that the other was negligent in failing to take the same attitude as to the necessity of hospitalization ashore. Our own experience vividly demonstrates that careful and competent men frequently reach different conclusions despite the fullest and most careful examination of all available data, including the difference of opinion on the part of their associates. In the present case, neither doctor had the benefit of all the facts of the eye's history. The character of the petitioner's affliction was not ascertained until days after the petitioner reached San Francisco, and then only after an outside consultant was called in to advise the eye specialists in the Marine Hospital. True it is that one doctor said, partly on the basis of the facts disclosed long after petitioner's eye had been removed, that he would have recommended hospitalization at Honolulu, and that additional treatment at the time petitioner was en route to San Francisco might have had a beneficial effect; but even on the basis of the knowledge available at the trial he would not venture an opinion that treatment such as was given at San Francisco would have saved petitioner's eye if given before or at the time he reached Honolulu. Another, and apparently equally well qualified, eye specialist testified that nothing in addition to the standard course of treatment for conjunctivitis, which the ship's doctor gave, could have been done with safety until after the petitioner's arrival in San Francisco, and that any attempt to do more probably would have actually impaired petitioner's chances of saving his eye. He testified, and without contradiction, that it was too much to expect of the ordinary general practitioner, such as the ship's doctor was, to be able to diagnose petitioner's case as a dangerous one.

In these circumstances, it is said that the ship's doctor should have sent the petitioner ashore, despite the petitioner's desire to return to San Francisco with the boat; and although there is no evidence what the facilities were at Honolulu. Had he put petitioner ashore only to have him lose his eye, it is conceivable that he would have been charged with neglect in doing that.

If there was malpractice in this case, no evidence of it has been put into this record. The surgeon who removed the eye was called as a witness. He testified that the cause of the trouble was a hemorrhage. But no professional opinion was offered as to when the hemorrhage took place. We do not know whether the ship's surgeon is accused of malpractice for failure to cure a hemorrhage which had already occurred when he was first consulted or because of failure to anticipate it and prevent it. Moreover, there is no proof whatever that, if a hemorrhage within the eye once occurred to an extent not absorbed by the ordinary natural processes, it is curable at all. If this petitioner was destined to lose his eye at all odds, he hardly establishes a cause of action by saying it should have occurred at Honolulu instead of San Francisco. Hospitalization either on ship or on land is not in itself a cure. At San Francisco, specialists had no cure for the eye but to remove it, and we are not told that anything different could have been done at any earlier stage with any probability that it would bring about a different result.

The doctor apparently made a wrong diagnosis, but that does not prove that it was a negligent one. It seemed to be the obvious diagnosis from the history which the patient gave him, and that appears to have been incomplete and not unlikely to mislead.

The loss of the petitioner's eye is a serious handicap. But damages may be recovered under the Jones Act only for negligence. *Jamison* v. *Encarnacion, supra,* at 639.

Whether the legislative policy of compensating only on the basis of proven fault is wise is not for us to say, nor is it our function to circumvent it by reading into the law a theory, however disguised, that a physician who undertakes care guarantees cure, and that each unsuccessful effort of the physician may be visited with a successful malpractice suit.

*Affirmed.*

MR. JUSTICE RUTLEDGE did not participate in the consideration or decision of this case.

MR. JUSTICE BLACK, dissenting:

The issue in this case is: shall a jury or a court decide whether petitioner lost his eye through the respondent's negligence?   I agree with the Court that the shipowner was liable for the negligence of its doctor, and I agree further that the Jones Act is not a workmen's compensation act and does not impose liability without fault; but I do not agree that a court may substitute its judgment on the facts for the decision of a jury when, as here, there is room for reasonable difference of opinion on the critical issue of the case.   I think there was sufficient evidence to permit a jury to find negligence in the doctor's failure to leave the petitioner at Honolulu for hospital treatment.

The evidence showed that this seaman sustained an injury so serious that it resulted in the eventual removal of his eye.   When a seaman is injured, the shipowner has an imperative obligation to come to his aid;[1] and the shipowner's responsibility is so heavy that he may be found negligent for failure to take his ship to the nearest port in order to provide adequate treatment.[2]   There is a similar obligation to leave a seriously injured seaman in a

---

[1] *Harden* v. *Gordon*, 2 Mason 541; *Reed* v. *Canfield*, 1 Sumner 195.

[2] *The Iroquois*, 194 U. S. 240, 242.

port at which a vessel has arrived.[3]   This duty of course exists where no adequate treatment can be given on the ship.   Here the ship's doctor was not an eye specialist; the ship did not have aboard the medicines which competent physicians in San Francisco applied; and there was no X-ray although one was later found essential for diagnosing the ailment.   It is not surprising that the ship should lack these facilities, for every merchant vessel cannot be a floating hospital; but it is for this very reason that a ship is required to furnish shore treatment for seriously injured seamen.

The United States Marine Hospital in Honolulu had all the facilities which the ship lacked.   These hospitals are recognized government institutions and a seaman has no burden to prove that the equipment and treatment in the hospital would have been better than the equipment and treatment on the ship.   Here, as in *Leone* v. *Booth Steamship Co.*, 232 N. Y. 183, 185, 133 N. E. 439, "It is to prefer shadow to substance to make the result of this action depend on affirmative proof of this matter."

What was the evidence on which the jury could have found that the seaman should have been left for treatment in this hospital?   The petitioner's eye began to pain him as a result of an accident on June 3, 1940.   By 7 o'clock the next morning, the eye was in such condition that he required medical treatment from the ship's doctor and was released from duty.   At 5 o'clock that afternoon the vessel docked at Honolulu.   The ship's doctor sent him to the Marine Hospital, which was closed at that hour, and he went to Queens Hospital which, according to the evidence, is an emergency institution connected with the Marine Hospital and which takes care of patients

---

[3] The United States guarantees the cost of maintenance and return to the United States of injured seamen discharged in foreign ports.   46 U. S. C. § 683.

temporarily. The doctor at Queens Hospital advised the petitioner that he should be released from his vessel and enter the hospital at once. This physician advised the seaman that he might lose his eye if he returned to the ship.

The petitioner returned to his vessel at 6 P. M. but was unable to see the ship's doctor until 11:30, approximately 30 minutes before the vessel sailed. He repeated to the ship's doctor the advice given him ashore. The seaman testified that the doctor told him that no danger would result from returning to San Francisco, and, since the doctor was his superior officer and an "accredited physician," he relied upon the doctor's advice although he was suffering intensely.

The petitioner's eye grew worse, treatment in the San Francisco Hospital failed to cure it, and it was removed. Two San Francisco specialists familiar with his case testified that they would have advised that he be left in Honolulu for hospital treatment. True, we have no testimony that the eye would have been saved by hospitalization at Honolulu, and whether it could have been will never be known; but it is clear that the petitioner would have received excellent treatment at an earlier date than he did. Adequate treatment, of course, is usually aimed at curing or alleviating the serious consequences of injuries and diseases, and timely treatment can prevent progressive physical deterioration. Someone must decide whether such happy results would have followed earlier hospitalization in the instant case.

Directing a verdict against the petitioner in this case is substituting judicial for jury judgment on factual questions which can as readily be decided by the layman as by the lawyer. When we consider the weight of the evidence and resolve doubtful questions such as these, we invade the historic jury function. "The right of jury trial in civil cases at common law is a basic and fundamen-

tal feature of our system of federal jurisprudence which is protected by the Seventh Amendment." *Jacob* v. *New York City*, 315 U. S. 752. This constitutional command should not be circumvented.

MR. JUSTICE DOUGLAS and MR. JUSTICE MURPHY join in this dissent.