**WALTON v. CONTINENTAL S. S. CO. et al.**
**No. 2652.**

District Court, D. Maryland.
April 1, 1946.

I. Duke Avnet, of Baltimore, Md., for plaintiff.

Ober, Williams & Stinson, of Baltimore, Md. (Southgate L. Morison, of Baltimore, Md., of counsel), for defendant Continental S. S. Co.

Bernard J. Flynn, U. S. Atty., and C. Ross McKenrick, Asst. U. S. Atty., both of Baltimore, Md., for defendant United States War Shipping Administration.

CHESNUT, District Judge.

In the above case a seaman is suing to recover for personal injuries caused by the alleged negligence of the Continental Steamship Company. The suit is brought under section 33 of the Merchant Marine Act of 1920, Jones Act, 46 U.S.C.A. § 688. For a separate cause of action the seaman demands reimbursement for maintenance and cure.

In addition to the Continental Steamship Company other respondents are the United States of America and the United States War Shipping Administration, both of whom have filed motions to dismiss against them respectively, and have not answered on the merits. When the case was recently called for trial the libelant elected to proceed to trial against the Continental Steamship Company alone without further delay which would be incident to a ruling on the motions to dismiss. At the hearing there was testimony in court given by the libelant in person and by two medical witnesses whose testimony related to the libelant's physical condition. The depositions of the master and chief mate of the ship were also submitted.

From the evidence in the case I find the following are the material facts.

1. The Continental Steamship Company is the owner of the SS "Bruce" which, at the time of the libelant's injury, was under time charter in customary form to the War Shipping Administration of the United States. It was conceded by counsel for

the Steamship Company that the liability, if any in this case, is upon the Steamship Company under the time charter.

2. The libelant, Walton, was employed on the "Bruce" as a pantry man from May 6, 1943 at wages of $87.50 per month and subsistence, with additional bonus when applicable. The ship sailed from New York on May 6, 1943 and arrived at St. Nicholas Bay, Aruba, in the West Indies, on May 23, 1943. It was docked at a dock owned or operated by the Lago Oil Company. The dock was a concrete structure about 35 feet wide parallel to the shore and joined at one end by a pier which led perpendicularly from the dock to the shore.

3. Walton went ashore on shore leave about dusk on May 24, 1943. He traversed the pier in doing so. He returned to the dock about 11.30 P.M., the same night to board the ship. On reaching the pier he passed through a gate where the guard examined some packages he carried, by the aid of a light which, according to Walton's testimony, was maintained constantly at night. The dock was otherwise totally dark in accordance with Naval blackout regulations. Walton walked to the end of the pier and turned right along the dock toward the ship which lay some 200 or 300 feet away parallel to the dock on the outshore side. The ship had a gangway of usual construction from the deck of the ship (an oil tanker) to the dock. When Walton had reached a point about 20 feet away from the gangway, he called out for the exhibition of a flash light by one of the ship's watchmen who he understood was stationed at or near the gangway for the convenience of the members of the crew returning from shore leave. There was no immediate response to his call, and without again calling or waiting in the darkness for a light to be given, he sought to find the gangway in the darkness. He said that he did not call again or wait for the watchman's return to the gangway because he thought the watchman might be elsewhere for a considerable period of time. The gangway had not been moved since he had left the ship, and he was able to find its approximate location by observing the ship's outline against the sky.

4. There was an old "coal chute" lying across the dock about 20 feet from the gangway and apparently approximately parallel to it. Walton mistook this coal chute for the gangway and proceeded to walk in it toward the ship. This coal chute was described as about 20 feet long and of width approximately equal to that of the gangway and with side walls no higher than four inches. It lay entirely upon the dock and extended toward the water within a distance of two or three feet short of the edge of the dock. Walton felt the chute with his foot, thought it was the gangway, walked toward the ship from the edge of the dock and fell into the water about 20 feet below, striking his knee and shoulder as he fell. The splash he made in falling was heard by some dock watchmen on or near the dock and he was promptly rescued.

5. After the accident the master of the ship made a typewritten report of the accident, based on verbal reports given to him by others, which stated, among other things, the following:

"Walton, upon returning to the ship evidently became confused and fell overboard from the dock. Harbor blackout regulations were observed at the time. Gangway watch was maintained throughout the night. The watchman failed to hear his approach.

"Q. What action was taken to prevent recurrence of the accident? A. The chute on dock was removed.

"Q. What statement did injured give as cause of the accident—Due to the blackout I mistook a chute next to the gangplank, which led to edge of dock, for the gangplank and stepped off the dock into the water."

6. At the time of the accident the ship had completed her loading, and no work was being done in that connection. The coal chute had not been used at any time on the two days that the "Bruce" was docked at Aruba either in connection with the "Bruce" or any other ship. It was described by a witness as an old piece of junk, lying on the dock. It had no relation in any way to the "Bruce".

7. As a result of his fall into the water with an oily surface, a good suit of clothes that libelant was wearing, and a watch became a total loss, of a valuation of about $100. He suffered a severe sprain of his right shoulder and left knee. Medical testimony shows that at the time of the trial, about two years after the accident, there was impaired mobility of about 10% in the shoulder and 20% to 25% limited motion in the knee, the principal incapacity in the latter being manifest on walking up steps.

8. The ship sailed from Aruba the next day, arriving at Bayonne, New Jersey, on June 6, 1943, when the crew was paid off. Walton received hospitalization at government expense at various hospitals or seamens' rest centers until he was finally discharged from the Gladstone New Jersey Convalescent Camp on August 19, 1943, with the recommendation for sea duty, unless arrangements were. made for an "upgrade school". He did attend an upgrade school and resumed sea duty on another ship in September 1943 at a better rate of pay than that received on the "Bruce". He is presently employed as chief steward on a ship.

Counsel for the libelant contends that negligence on the part of the ship has been shown in two respects: (1) permitting the coal chute to remain upon the dock and (2) the absence of the watchman from the gangway and his failure to answer Walton's call and show a flash light.

I find no negligence attributable to the ship with respect to the coal chute. It belonged to or was under the control of the dock owner. It had no relation to the ship in any way. Although the master's report of the accident states that the chute had been removed, it seems entirely clear from the evidence that if there was any duty with respect to the chute it was on the dock owner and not on the ship as the chute had not been used by the ship. Walton says in the dark he mistook the coal chute for the gangway. This was indeed a regrettable and extraordinary occurrence. It was not reasonably foreseeable by anyone. The construction of the chute was materially different from that of the ordinary ship's gangway which, as described in the evidence, was of wooden construction perhaps 36 inches wide by 35 feet long and had ropes on both sides and cleats or slats over the floor, the slats running lengthwise and the cleats across the floor of the gangway. The coal chute, while of the approximate width and length of the gangplank, had side walls only a few inches high and no side ropes and presumably no cleats. Even in a dense blackout the libelant with the exercise of the most ordinary care could have distinguished difference between walking on the coal chute and on a ship's gangway.

The case with respect to the watchman at the gangway is more difficult to decide. The master of the ship, testifying by deposition more than two years after the accident, described the practice and purpose with respect to the watchman at the gangway as follows:

"Yes, we had a seaman stationed at the gangway, and his orders were that any one approaching the gangway, he was to make a light for them so they could board the ship safely. * * *

"Q. How was the A. B. (seaman) on watch at the gangplank to ascertain that some one was approaching the ship to come on board? A. Well, in spite of the darkness, I am sure that a man could see sufficiently far enough away from the gangplank that he could see some one approaching. And ordinarily they come back in groups, and there is usually conversation. He could hear that at some distance.

"Q. Was the purpose of the A. B. to light the men along the dock, or merely to show them where the gangway was, as he heard them approaching the ship? A. Merely to assist them across the gangway with the light.

"Q. Across the gangway itself? A. That is right."

Likewise the Chief Mate of the ship testifying by deposition more than two years after the accident said:

"Q. Where was the watch on the ship stationed? A. On the gangway there was always an Able Bodied Seaman, sometimes two.

"Q. What were they stationed there for? A. To guide fellows going and coming at night and to keep a general watch on the ship. They used blue-lens flashlights to guide the men across the gangway between the ships and the dock, when they were returning to the ship or leaving it. The other Able Bodied seaman would keep a watch on the lines and up the alleyways on the ship. In other words, a general watch, which is to patrol around the ship to see that everything is in good shape.

"Q. Were your men supposed to light the men while they were on the dock? A. Yes, when we saw them approaching.

"Q. Was that on the gangway or while they were on the dock? A. On the gangway and when they were leaving the gangway, or approaching it. * * *

"Q. Were you required to light the men along the dock, or were you just required to light them along after they reached the gangway, coming aboard? A. After they reached the gangway, coming aboard ship, 'Approaching' would be a little better way to say it."

There was no positive evidence as to whether there was a watchman at the gangway when Walton approached it. The ship's crew had been paid off and dispersed on June 6, 1943. Presumably it was not possible to locate and take the depositions of these seamen if indeed their identity was known to the ship owners before the trial of the case, nearly three years after the accident. The only direct evidence as to just what happened is given by Walton himself. He says that when he arrived about 20 feet from the gangway he called out for a flash light from the watchman who should have been at the gangway; but got no response. Getting no response, he said he inferred that the watchman was away and might continue to be away for an hour or two. Without making any further request for a light he immediately started to board the ship walking the length of the coal chute and then stepping off the dock with the consequent fall. In so attempting to board the ship in the blackout he stepped from a place of immediate safety into danger.

■■ Under this rather meager evidence the question of law is whether there was primary negligence attributable to the ship on the part of the gangway watchman. The burden of proof to establish negligence is on the libelant, and it must be admitted, I think, that the evidence is not completely satisfactory. But dealing with the only evidence upon the subject that we have, I conclude that it is sufficient to warrant an inference that the watchman was temporarily absent from his post and not within hailing distance from Walton who was only 20 feet from the gangway; and I think this establishes negligence by the ship to a slight degree at least. The Chief Mate said Walton fell from the dock 250 feet away from the gangway. If this could be accepted as a fact, it would clearly explain the accident and acquit the ship of any negligence, but it appears the mate's statement was based only on a report and was therefore hearsay only, and it was contrary to the only evidence on the point, Walton's express testimony.

The next question is whether this slight degree of negligence constituted the proximate cause of Walton's injury. Here it is somewhat difficult to distinguish between the slight negligence of the ship and the much greater contributory negligence of Walton as the proximate cause of the accident, but I conclude that the ship's negligence contributed in some degree to the accident.

As heretofore stated, the suit is based on the Jones Act, 46 U.S.C.A. § 688, which incorporated the rules of the Federal Employers' Liability Act, 45 U.S.C.A. § 51. The Arizona v. Anelich, 298 U.S. 110, 56 S.Ct. 707, 80 L.Ed. 1075. The Employers' Liability Act, 45 U.S.C.A. § 51 et seq., makes a carrier liable to an employe for an injury "resulting [entirely] or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, * * * or other equipment." By section 53 of 45 U.S.C.A. the fact that the employe may have been guilty of contributory negligence shall not be a bar to recovery "but the damages shall be diminished by the jury in proportion to the amount of negligence

attributable to such employee." Section 54 of 45 U.S.C.A. has also abolished the assumption of risk as a bar to recovery. See also The Arizona v. Anelich, supra.

■ It was an early view of the Jones Act that it did not cover injuries to seamen occurring on shore, including the dock adjacent to the ship, it being thought insufficiently clear that Congress had intended so radical a disturbance of the traditional bounds of admiralty jurisdiction. Todahl v. Sudden & Christenson, 9 Cir., 5 F.2d 462; but this view was rejected in O'Donnell v. Great Lakes Dredge & Dock Co., 1943, 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596, allowing a recovery to a seaman injured while working ashore. And it has been held in the Second Circuit that a seaman returning to the ship after shore leave is acting in the course of his employment under the Jones Act. Marceau v. Great Lakes Corp., 2 Cir., 146 F.2d 416. The existence of the conditions resulting from the blackout did not exempt the ship from exercising due care with regard to the returning seamen. Knight v. Sheffield Corp., K.B.Div.1942, 167 Law Times 203. And numerous recent court decisions emphasize the liberality which should be accorded to seamen in their relation with the ship in suits under the Jones and other maritime Acts. The Arizona v. Anelich, supra; Koehler v. Presque-Isle Transport Co., 2 Cir., 141 F.2d 490; De Zon v. American President Lines, 318 U.S. 660, 63 S.Ct. 814, 87 L.Ed. 1065.

■ In estimating the damages to be awarded the libelant I have carefully considered the medical testimony with respect to the libelant's past and present physical condition. He asks for an allowance of $5,000. I think this would be too large even if his injuries were solely attributable to the negligence of the ship and without deduction on account of his own contributory negligence. As previously indicated, the proven negligence of the ship in this case was slight and the contributory negligence great. Without going into minute calculations, I conclude that an allowance of $500. to the libelant will be the proper amount of damages for his injuries, including the property loss.

■ He is also entitled to the expenses of his maintenance for the few days from June 7 to 10, 1943, when he was an outpatient awaiting Government hospitalization in New York. Aguilar v. Standard Oil Co., 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107. I assume that counsel can agree upon this amount. An appropriate decree can be presented by counsel in due course.