### GIBSON v. UNITED STATES et al.

### No. 75 of 1947.

United States District Court
E. D. Pennsylvania.

April 22, 1953.

Freedman, Landy & Lorry, Philadelphia, Pa., for plaintiff.

Gerald A. Gleeson, U. S. Atty., and Krusen, Evans & Shaw, Philadelphia, Pa., for defendants.

KALODNER, District Judge.

The libellant commenced this action against the United States under the Suits in Admiralty Act, 46 U.S.C.A. § 742, to recover maintenance and cure and damages for negligence. The liability of the respondent for maintenance and cure has already been determined in the libellant's favor by this Court: 100 F.Supp. 954, affirmed 3 Cir., 1952, 198 F.2d 928. At this time, there remains to be disposed of only the issue of negligence. It is libellant's contention, in brief, that a United States Public Health and Quarantine physician was negligent in failing to render to him, as he puts it, "prompt, proper and adequate medical care and attention."

It is undisputed that the libellant was, in January, 1946, employed as a second assistant engineer aboard the S. S. Ernest W. Gibson, which vessel was owned by the respondent and operated by the International Freighting Corporation under a standard form of agency agreement. It is likewise undisputed that in March, 1946, while aboard the vessel, the libellant suf-

fered a coronary thrombosis which disabled him. It is this fact which is made the basis of this action.

In the course of litigation, I made certain rulings which should be reiterated for the sake of clarity.

In September, 1946, the libellant brought an action against the general agent asserting unseaworthiness and negligence as the cause of the injury here involved. A jury verdict was returned in favor of the general agent. The jury specially found in answer to interrogatories, that (1) there was no failure to provide or keep in proper order a throttle which the libellant claimed was defective and which, in the strain of operation, induced his heart condition; and (2) there was no failure to provide and obtain proper care and attention for the libellant. On appeal, the judgment entered on the jury verdict was affirmed. Gibson v. International Freighting Corp., 3 Cir., 1949, 173 F.2d 591, certiorari denied 338 U.S. 832, 70 S.Ct. 78, 94 L.Ed. 507. In the course of that litigation, the libellant had sought a new trial on the ground that he had newly discovered evidence relating to the throttle incident which had been disputed before the jury. The libellant was not successful on this score.

In February, 1947, the libellant commenced this action. In all material respects, the libel in the instant case is the same as the complaint in the action against the general agent. The respondent moved to dismiss on the authority of Bruszewski v. United States, 3 Cir., 1950, 181 F.2d 419, certiorari denied 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632, which holds that a plea of *res judicata* will lie against a libellant who predicates his claim against the vessel's owner upon the same acts or omissions asserted in an earlier, unsuccessful, action against the general agent.

The substance of the libellant's position in this regard is that the verdict in favor of the defendant in the prior action constituted a finding that, having secured advice from a usually competent source, a United States Public Health and Quarantine Service physician, the general agent was not responsible if the advice proved incorrect. However, the libellant contends that the action at bar is based upon the neglect of the physician, for which the respondent here is liable. Cf. DeZon v. American President Lines, 1943, 318 U.S. 660, 63 S.Ct. 814, 87 L.Ed. 1065. This neglect, he says, could not have been asserted against the general agent, since it had no control over the physician: therefore, the judgment in the prior action is not a bar here. The libellant would retry all of the issues of the prior action, as well as the issue of the negligence of the physician.

In addition to controverting this analysis, see Jensen v. U. S. War Shipping Administration, D.C.E.D.Pa.1949, 88 F.Supp. 542, affirmed on other grounds 3 Cir., 1950, 184 F.2d 72, the respondent contends that the libel herein cannot support a recovery against the United States as a shipowner for the negligence of a federal Public Health and Quarantine Service physician, and that the libel is not broad enough to admit proof of the physician's neglect.

On August 19, 1952, I entered an order denying respondent's motion to dismiss. I concluded that the general allegation of the libel, that the respondent failed "to provide libellant with proper and adequate medical care and attention" was sufficient to permit proof of the physician's negligence. There was, in my opinion, no surprise which could have harmed, or did harm, the respondent upon this construction of the libel in accordance with the liberal practice that prevails particularly in light of the wide opportunity afforded both sides in the production of evidence. Moreover, I did not believe that the separability of respondent's function as a shipowner from its function as operator of the Public Health and Quarantine Service, at least in the context of this case, was so clear-cut in legal effect as to warrant the barring of the libellant *in limine*.

However, on September 11, 1952, following pre-trial conference, I entered an order restricting the consideration of the evidence to the issue of the negligence of the physician. The decision of the Bruszewski case was thereby given effect, saving to the libellant the issue which he could not have as-

serted properly in the prior action against the general agent.

The parties have conveniently stipulated to the use in this case of the evidence adduced at the prior trial, and have taken additional testimony,[1] all of which I have restricted in consideration of the ruling above related.

I make the following

## Findings of Fact

1. At the time material hereto, the S. S. Ernest W. Gibson was owned by the respondent, the United States, and operated by International Freighting Corporation, under a standard form of general agency agreement.

2. The libellant, Arthur W. Gibson, was employed aboard the S. S. Ernest W. Gibson as second assistant engineer on a voyage which commenced at Baltimore, Maryland, in January, 1946.

3. On March 14, 1946, the libellant was on watch in the engine room between midnight and 4:00 A. M., when he experienced a sudden pain in the region of the lower part of his chest. An oiler went to the purser for him and obtained some bicarbonate of soda. The pain subsided after about ten minutes and the libellant resumed his duties without ill effects or symptoms.

4. On March 15, 1946, the libellant suffered an attack of relatively short duration while on duty.

5. On March 16, 1946, the libellant, shortly after coming on the midnight watch, again suffered a pain in the region of his lower chest. On this occasion he was relieved of his duties by the chief engineer and sent to bed. He was visited by the purser who administered spirits of ammonia, took his temperature, pulse and respiration, which were nearly normal and rubbed his chest with oil of wintergreen. The pain subsided after about twenty minutes. The purser found that the libellant was sweating and pale. The libellant was also visited by the Master.

6. On March 16, 1946, the vessel arrived at Jacksonville, Florida and the Master went ashore for the purpose of obtaining medical assistance for the libellant. The libellant had been relieved of his duties, was resting, and was suffering no pain at the time.

7. The Master communicated by telephone with a physician of the United States Public Health and Quarantine Service at Jacksonville. At the time, the Master was at least aware of the facts recited in Finding of Fact No. 4 and the last sentence of Finding of Fact No. 5.

8. The physician informed the Master that it was not necessary for him to come aboard; that the libellant should not work, but should rest; that the libellant should have a light diet and his bowels kept open. He also told the Master "to give him phenobarbital for his nerves in case he had another attack and to keep the patient in bed and keep him warm."

9. On March 18, 1946, the libellant suffered another, more severe and prolonged attack, as a result of which the vessel was turned around and proceeded to Key West, Florida, where he was removed to a hospital.

10. The attacks suffered by the libellant on March 14, 15 and 16, were coronary insufficiencies. The attack suffered by the libellant on March 18, 1946, was a coronary thrombosis.

11. It is not inconsistent with good medical practice to permit one who has suffered attacks of coronary insufficiency to be ambulatory or to fail to require that he be removed to a hospital or to have absolute bed rest.

12. The libellant would have had the coronary thrombosis with myocardial infarction regardless of what was done for him, and the size of the infarction was not determined by whether he had been given a coronary dilator or not; coronary dilators merely relieve pain and are not curative or preventive in their action or effect.

---

1. Libellant took depositions on October 23, 1952, in Jacksonville, Florida of two physicians employed by the United States Public Health Service; they were offered in evidence at a further hearing on October 27, 1952, at which time additional testimony was taken of Dr. William D. Stroud, a respondent witness.

## Discussion

The evidence in the case presents certain difficulties of reconciliation. There was evidence that the libellant suffered an attack of relatively short duration on March 15, 1946. But this was tied closely to the issue of the alleged defective throttle, which the jury in the action against the general agent found was in proper working order. Whether the jury also concluded that the libellant did not suffer an attack cannot be said. It is not important: I have found that the Master was not aware of it at the time he spoke to the physician, and that is, of course, a most significant time; also, the medical testimony in the case was based on the assumption that such attack did occur, so that the libellant is not harmed. I have found, further, that the Master was acquainted with the incident which occurred on March 16. He may also have been aware of the incident of March 14, but he testified that he did not learn of it until March 18, two days after he spoke to the physician. His testimony in this respect is not unlikely, since the matter was treated as relatively minor by the libellant himself.

I accept the testimony of the Master that he spoke to a physician of the United States Public Health and Quarantine Service. Because it is critical to the issue, I have made as specific a finding as possible as to the advice given by the physician. What the Master knew at the time he spoke to the physician, and in what manner he presented those facts, cannot be precisely established. Undoubtedly the recitation would reflect the Master's and the purser's feeling that the libellant suffered from acute indigestion, if their testimony as to their opinion is accepted.

The libellant contends that the physician should have come aboard to examine him; that he should have been removed to a hospital; that he should have been confined to bed, with meals served, and with the use of a bed pan; and that a medication known as a "dilator" should have been administered. If these things had been accomplished, he maintains, he would not have had the attack of March 18, or he would not have had it so soon and the heart injury would not have been so great.

A thrombosis builds up over a period of time, but just when the occlusion will take place cannot be predicted. The attacks which the libellant suffered prior to March 18 were described as "pilot" attacks of coronary insufficiency pointing toward the build-up for the thrombosis. However, as respondent's heart specialist, Dr. Wolferth, explained, it is only after the thrombosis occurs that they can be called "pilot" attacks; both he and Dr. Stroud testified that a patient may go on having repeated attacks of the same symptoms before suffering the thrombosis. The use of a "dilator" is primarily to relieve the pain of the attack of coronary insufficiency. It is not curative or preventive in its action or effect. Dr. Wolferth also testified, and I credit his testimony, that "relatively new" anticoagulation medicines are not usually applied in hospitals, and it is not often done owing to the lack of assurance that the blood clotting process is going on and to the length of time necessary to study the patient's blood coagulation time.

The medical testimony makes plain the conclusion that the specialists in the profession are not in agreement as to whether complete or absolute bed rest is mandatory, or even desirable in the case of an attack of coronary insufficiency. They are not in agreement on the effect of absolute bed rest upon the incidence of thrombosis. Dr. Wolferth summarized it very well as follows:

"One of the things that bother us doctors most is how we are going to stop a person from getting an attack of acute coronary occlusion or complete blockage of a vessel, once symptoms pointing in that direction have begun to manifest themselves.

"Now, there are some doctors who would put such patients to bed immediately, and if you do that, then you will find that even then a patient will get coronary occlusion.

"There are others, like myself, who think if you put such patient to bed you thereby slow the coronary blood flow and you favor the clotting process, so that if I think a patient is threatened with that condition, and nothing happens so far as I am able to see, I don't put such patient to bed. I keep watching, yes, but I let him sit around the

room. Now, some of my patients go on and develop acute coronary thrombosis under these conditions. This is one of the matters in medicine that is just not settled at the present time. One of the many things we don't know as much about as we would like.

"So, I think it would depend on the doctor's predilection in the matter, whether he would think that the man would be benefitted or harmed by not putting him in bed in a hospital. Personally, if the man was quiet and comfortable, I don't think he was harmed." (N.T. 407.)

Dr. Stroud, the other heart specialist whose testimony was adduced by the respondent, stated that patients suffering coronary insufficiencies may be permitted to do those things which do not cause pain.

The medical experts whose testimony was adduced by the libellant differed in their viewpoint from opinions stated with respect to the treatment involved. But their testimony serves only to emphasize the counter-vailing opinions in the profession. It does not prove that the choice of the one view over the other amounts to negligence. Graham v. Alcoa S. S. Co., 3 Cir., 1953, 201 F.2d 423.

The libellant was relieved of duty and resting from the time he suffered the attack on March 16 until the attack on March 18. The latter attack occurred while he was resting in a deck chair. The libellant's physicians believed absolute bed rest would have made a difference. The respondent's physicians believed that the thrombosis was going to occur, and Dr. Wolferth stated that it would have occurred at the time it did, whether he was confined to bed or not; undoubtedly Dr. Wolferth, upon the quotation above, felt that he was perhaps slightly better off. I am obliged to conclude that insofar as present medical knowledge furnishes a basis for opinion, whichever treatment this libellant received, the risk was as great that he would have the thrombosis as he did have.

I therefore, state the following

## Conclusions of Law

1. Libellant has failed to sustain the burden of proof in his attempt to establish negligence on the part of the respondent.

2. There was no negligence or dereliction of duty on the part of the respondent.

3. Libellant received prompt, proper and adequate medical care and attention.

4. The cause of action against the United States of America and United States Maritime Commission should be dismissed.

An Order may be submitted in accordance herewith.