**SHELTON v. SEAS SHIPPING. CO., Inc., et al.**

**No. 3175.**

District Court, E. D. Pennsylvania.

Sept. 11, 1947.

See also D.C., 7 F. R.D. 233.

Milford J. Meyer, Robert M. Bernstein and Herbert E. Millen, all of Philadelphia, Pa., for plaintiff.

Krusen, Evans & Shaw, Thomas E. Byrne and Rowland C. Evans, all of Philadelphia, Pa., for defendants.

Evans, Bayard & Frick, John B. H. Carter and Benjamin O. Frick, all of Philadelphia, Pa., for third-party defendant.

GANEY, District Judge.

This civil action was brought by a longshoreman under the general maritime law for damages for personal injuries sustained by him while he was employed on a vessel.

From the evidence presented to it, the court makes the following

Findings of Fact.

1. The original plaintiff was Patrick Shelton, a longshoreman and a citizen of the State of Pennsylvania.

2. Laura Shelton, executrix of the estate of Patrick Shelton, has been substituted as plaintiff in this action.

3. The defendant is Seas Shipping Company, Inc., a corporation organized and existing under the laws of the State of New York, which brought Jarka Corporation, an independent stevedoring concern, upon the record as a third-party defendant.

4. On December 23, 1942, and prior thereto, the Steamship Robin Tuxford, owned and operated by the defendant, was moored at Pier 84 South, in the Delaware River, navigable waters, at Philadelphia, within the territorial limits of the Eastern District of Pennsylvania.

5. The No. 1 hatch of the Robin Tuxford was 20 feet long and 24 feet wide. The hatch covers, which weighed 8,000 pounds, consisted of two sections (a fore and aft section) of approximately equal dimensions and weight. The two sections of the hatch cover were hinged together; the fore section, in turn, being hinged to the fore upper edge of the hatch coaming. Two operations, with the aid of the ship's lifting gear, were necessary to open the hatch. The first required the aft section of the cover to be lifted or swung bowward through an angle of 180 degrees until it rested or folded on the fore section of the hatch cover. The second operation required the two sections, in turn, to be lifted or swung through an angle of approximately 100 degrees until they rested against a stanchion.

6. The ship's lifting gear which worked the No. 1 hatch was situated aft the hatch. The star-board boom was between 55 and 60 feet in length and pivoted from a 10 foot high platform or rail approximately 11 feet aft the hatch. The topping lift of this boom ran from the peak of the boom to the tip of the 35 foot foremast or king-post, which was amidships and also approximately 11 feet aft the hatch. The topping lift fall or cable descended from the top of the foremast to a block near the boom platform and thence to the topping lift winch aft of the foremast. The up and down or midship fall or cable ran from the electric starboard winch (which occupied part of the space between the No. 1 hatch and the boom platform, and had no connection with the lifting or lowering of the boom), lead upward to a block near the heel of the boom, ran along the under side of the boom through a fair-lead two-thirds up the boom, reeved a second block attached to the peak of the boom, and then dropped vertically to the ship's deck. The lever which controlled the starboard winch was immediately aft the hatch.

7. The midship fall or cable was a 6 by 19 best plough steel hemp cushioned cable,

three-quarters of an inch in diameter. On December 23, 1942, this fall had a minimum breaking tensile strength of 46,000 pounds and a safe working load capacity of approximately five tons.

8. The defendant employed Jarka Corporation, Patrick Shelton's employer, as an independent contractor to load the Robin Tuxford.

9. On December 23, 1942, and prior thereto, the employees of Jarka Corporation were in sole control of the booms, winches, cables and other lifting gear situated at the No. 1 hatch of the Robin Tuxford. None of this lifting gear was supplied by Jarka Corporation or its employees.

10. On the morning of December 23, 1942, the first operation to be performed by the stevedores on the ship was the removal of the No. 1 hatch covers, which had been removed and replaced by them on the previous day, with the lifting gear in question. The peak of the starboard boom, which was used to raise the covers of the No. 1 hatch, was approximately 45 feet above the level of the deck, and extended to a line approximately one foot aft the fore edge of the hatch, and so for the purpose to which it was put, the boom was in an improper position, as the boom should have been lowered, so that its peak would have extended beyond the fore edge of the hatch. It was the hatch-tender's duty to change or order the change of the position of the booms in any case when there was need for it.

11. At about 8:00 o'clock, with Patrick Shelton controlling the starboard winch, the first operation of the opening of the No. 1 hatch was performed without the boom being moved. During the process of the second operation, the hatch covers were lifted to almost a vertical position. Shelton apparently believing that the covers had gone beyond the vertical position and that they would continue to swing toward the bow of the ship and rest against the stanchions, overhauled the winch, which caused the fall to slacken. The covers, instead of falling toward the stanchions began to fall toward the hatch.

While the covers were in the process of falling, Shelton reversed the winch.

When the slack in the cable had been taken up by the winch and the falling edge of the hatch covers, the cable parted at a point along its vertical portion, 5 to 10 feet below the peak of the boom.

12. The hatch covers fell to the coaming, and the remaining portion of the cable, not attached to the covers, unreeved the block at the peak of the boom, coiled around the fair-lead and pulled it from the boom.

13. The fair-lead, in falling to the deck, struck Patrick Shelton on the head, fractured his skull and rendered him unconscious. He was immediately removed from the vessel and taken to Mt. Sinai Hospital.

14. The cause of the parting of the cable was due to the sudden inordinate tension or excessive stress placed upon it by the falling covers, and not to progressive failure of the cable.

15. The lifting gear at the No. 1 hatch of the Robin Tuxford, at the time Patrick Shelton was injured, was seaworthy.

16. On June 24, 1943, Patrick Shelton died as the result of injuries sustained by him on December 23, 1942.

17. Prior to his death, Patrick Shelton elected to recover from the third person who he determined was liable in damages for the injuries sustained by him, and brought this action on May 24, 1943.

18. On July 15, 1943, Laura Shelton, executrix of the estate of Patrick Shelton, deceased, was substituted as plaintiff in this action.

19. In October of 1943, the defendant brought Jarka Corporation upon the record as a third-party defendant.

20. On December 21, 1945, three years less two days after the cause of action arose, the substituted plaintiff filed a motion for leave to amend the complaint to include (a) an assertion of unseaworthiness of the S. S. Robin Tuxford as an additional cause for recovery, and (b) a claim for the loss of support by the deceased's widow and minor child who were alleged to have been dependent upon him prior to this death. Leave was granted[1] by the court, and the amended complaint was filed on January 29, 1944.

---

[1] D.C., 7 F.R.D. 233.

21. The defendant did not amend its third-party complaint.

22. At the trial, the plaintiff, relying entirely upon the theory of unseaworthiness of the vessel and its equipment, not only failed to offer evidence of, but specifically abandoned, negligence as a basis for recovery. The plaintiff also relinquished the claim for the loss of support under the amended complaint.

### Conclusions of Law.

1. This court has jurisdiction of the parties and of the subject matter of this action.

2. Laura Shelton has been duly appointed executrix of the estate of Patrick Shelton, deceased, and she has been properly substituted as plaintiff in this action.

3. The amendment to the complaint related back to the date the original complaint was filed since it did not state a new cause of action.

4. The injuries which caused the death of the decedent were sustained by him while he was performing a maritime service on navigable waters within the territorial limits of the State of Pennsylvania.

5. The plaintiff, having failed to prove that the vessel or its appliances were unseaworthy, is not entitled to recover from the defendant.

6. The third-party plaintiff is not entitled to recover from the third-party defendant.

7. The defendant and the third-party defendant are entitled to judgment against their respective plaintiffs.

### Discussion.

■ Both the original and the amended complaints claimed the benefits of the Jones Act.[2] Recovery under this Act may be had only by a "seaman" from his employer. In this case, the defendant was not the employer of the decedent. Hence the benefits of the Jones Act may not be invoked in this action. Kwasizur v. Dawnic S. S. Co., D.C., E.D.Pa., 25 F.Supp. 327; The New Brooklyn, D.C.Mass., 37 F.Supp. 955; Eggleston v. Republic Steel Corporation, D.C., W.D.N.Y., 47 F.Supp. 658. But even assuming that the relationship of employer and employee did exist, it would seem that the plaintiff's position is inconsistent, for she has abandoned all claims based on negligence, which is the gist of an action brought under the Jones Act. Jamison v. Encarnacion, 281 U.S. 635, 50 S.Ct. 440, 74 L.Ed. 1082; De Zon v. American President Lines, 9 Cir., 129 F.2d 404, 409, affirmed 318 U.S. 660, 63 S.Ct. 814, 87 L. Ed. 1065.

■ Even though a common-law remedy is not sought in this action, since there is diversity of citizenship between the parties and the amount in controversy exceeds the statutory amount, it is clear that this court has jurisdiction over this action. Philadelphia & R. R. Co. v. Berg, 3 Cir., 274 F. 534, 538, certiorari denied 257 U.S. 638, 42 S.Ct. 50, 66 L.Ed. 410. See also Stamp v. Union Stevedoring Corp., D.C., E.D. Pa., 11 F.2d 172, 173 and Erlich v. Wilhelmsen, D.C., E.D.N.Y., 44 F.Supp. 414.

■ Under the general maritime law there was no right of recovery for wrongful death caused by negligence. The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358; Butler v. Boston and Savannah S. S. Co., 130 U.S. 527, 9 S.Ct. 612, 32 L.Ed. 1017; Western Fuel Co. v. Garcia, 257 U.S. 233, 42 S.Ct. 89, 66 L.Ed. 210; 1 Benedict on Admiralty (6th Ed.1940), p. 372; Robinson on Admiralty (1939), p. 135. The rule was the same even though the death was caused by the unseaworthiness of the vessel. Lindgren v. United States, 281 U.S. 38, 50 S.Ct. 207, 74 L.Ed. 686. Prior to the enactment of federal statutes on the subject, the various state statutes were given force and effect by the maritime law in order to supply a much needed right of action for wrongful deaths which occurred on navigable waters. The Harrisburg, supra; The Hamilton, 207 U.S. 398, 28 S.Ct. 133, 52 L.Ed. 264; The Corsair, 145 U.S. 335, 12 S.Ct. 949, 36 L.Ed. 727; Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L. Ed. 1086, L.R.A.1918C, 451, Ann.Cas.1917E, 900; Robinson on Admiralty (1939) pp. 137–138. The Death on the High Seas Act[3] of 1920 gave a cause of action for wrongful

---

[2] Section 33 of the Merchant Marine Act of June 5, 1920, 41 Stat. 1007, 46 U.S.C.A. § 688, extending to "seamen" the benefits of the Federal Employers' Liability Act, 45 U.S.C.A. §§ 51–60.

[3] Act of March 30, 1920, c. 111, Secs. 1–7, 41 Stat. 537, 46 U.S.C.A. §§ 761–767.

death which occurred on the high seas outside of the territorial limits, or a marine league from the shore, of any state. Section 7 of the Act, 46 U.S.C.A. § 767, provides that: "The provisions of any State statute * * * shall not be affected by this Act. Nor shall this Act apply * * * to any waters within the territorial limits of any state * * *". The Jones Act gave a right of action for the death of a "seaman" which occurred in the course of his employment as the result of his employer's negligence. This Act is paramount to any state death statute which might otherwise apply. Lindgren v. United States, supra. The Longshoremen's and Harbor Workers' Compensation Act[4] provides for compensation where an employee, not a master or member of a crew of a vessel becomes incapacitated as the result of injuries sustained by him while he was upon navigable waters and if recovery through workmen's compensation proceedings may not validly be provided by state law. If the employee dies as the result of the injuries, compensation terminates and death benefits become payable. The remedy provided under this Act is exclusive as against the employer of the deceased. Swanson v. Marra Brothers, Inc., 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045. However, the person entitled to receive compensation or benefits may elect to bring an action against a third person who he determines is liable in damages for the injury or death sustained. Outside of the large field governed by the above mentioned statutes, the general maritime law was left to pursue its own development. At present one of its rules is that where death "follows from a maritime tort committed on navigable waters within a state whose statutes give a right of action on account of death by wrongful act, the admiralty courts will entertain a libel in personam for the damages sustained by those to whom such right is given". Western Fuel Co. v. Garcia, supra, 257 U.S. at page 242, 42 S.Ct. at page 90, 66 L.Ed. 210. See also Just v. Chambers, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903; American Stevedores, Inc. v. Porello, 330 U.S. 446, 459, 60 S.Ct. 847, 91 L.Ed. ——. Similarly, where a suitor, after having brought an action for injuries sustained as the result of a maritime tort, dies as a result of those injuries prior to verdict or judgment, the general maritime law will permit the person who is given such right under the survival statute of the state in whose navigable waters the tort occurred, to be substituted as libellant or plaintiff, as the case may be, in the suit or action. The City of Belfast, D.C., E.D.Pa., 135 F. 208.

Section 35(a) of The Pennsylvania Fiduciaries Act[5] provides that no personal actions shall abate by reason of the death of the plaintiff and his personal representative may be substituted as plaintiff. In addition the Pennsylvania Act[6] of 1937 provides that the personal representative may commence and prosecute all personal actions which the decedent might have commenced and prosecuted. No time limitation within which actions must be commenced by the personal representative was provided for in the latter Act. However in Stegner v. Fenton, 351 Pa. 292, 296, 40 A.2d 473, 475, the Supreme Court of Pennsylvania said: "Since a suit by a personal representative under the Act of 1937 is identical to that which decedent might have commenced and prosecuted during his lifetime and, therefore, governed by the same measure of damages, it is but logical to conclude, the legislature, not having provided to the contrary, that the same limitation as to time when suit must be instituted governs, whether the action be brought by the injured person during his lifetime, or by his personal representative under the Act of 1937 after his death; that is, as set forth in the Acts[7] of 1713 and 1895, * * * 'within two years from the time when the injury was done.'" Also see Berry v. Franklin Plate Glass Corp., D.C., E.D.Pa., 66 F.Supp. 863, affirmed, 3 Cir., 161 F.2d 184.

---

[4] Act of March 4, 1927, c. 509, 44 Stat. 1439, 1440, as amended, 33 U.S.C.A. § 931 et seq.

[5] Act of June 7, 1917, P.L. 447, Sec. 35(a), as amended, 20 P.S. § 771.

[6] Act of July 2, 1937, P.L. 2755, Sec. 2, 20 P.S. § 772.

[7] Acts of March 27, 1713, 1 Sm.L. 76, Sec. 1, 12 P.S. § 31, and June 24, 1895, P.L. 236, Sec. 2, 12 P.S. § 34.

The defendant objected to the amendment to the complaint which alleges unseaworthiness as an additional ground for recovery. The reason given for this objection is that the amendment states a new cause of action and, therefore, is barred by the Pennsylvania statute of limitations. Regardless of whether the state statute of limitations or the doctrine of laches would otherwise be applicable, we are of the opinion that the amendment to the complaint was proper. What constitutes a new cause of action is to be determined in accordance with the rules of practice and procedure of the forum in which the action is brought. See Steamboat Co. v. Chase, 16 Wall 522, 83 U.S. 522, 21 L.Ed. 369. Rule 15(c) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, provides: "Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading". In this action the original complaint alleged that on December 23, 1942, by reason of the negligence of the defendant, deceased was struck and injured by equipment belonging to the defendant. The amended complaint, in addition to reiterating the charge of negligence, alleged that the injuries sustained by the deceased were caused by the defendant's failure to provide him with a safe and seaworthy vessel and appliances, and to keep them in a safe and seaworthy condition. There can be no question that the amended complaint asserted a claim which arose out of conduct and occurrences set forth in the original complaint. It did not allege a new cause of action, but only a new or different ground or theory for recovery. Consequently, the amendment related back to the date the original complaint was filed.[8] See Tiller v. Atlantic Coast Line R. Co., 323 U.S. 574, 580, 581, 65 S.Ct. 421, 89 L.Ed. 465; Isaacks v. Jeffers, 10 Cir., 144 F.2d 26; Wall v. Brim, 5 Cir., 145 F.2d 492, cer-

tiorari denied 324 U.S. 857, 65 S.Ct. 858, 89 L.Ed. 1415. White v. Holland Furnace Co., D.C., S.D.Ohio, 31 F.Supp. 32. Even though the right to maintain an action may be determined by following the state law, if the substantive rights and liabilities on which the cause of action is predicated are those which are deeply rooted in the admiralty law, as they are in this case, such rights and liabilities must be determined in accordance with the principles of the general maritime law, and not those of the state law.[9] Garrett v. Moore-McCormack Co., Inc., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239; Chelentis v. Luckenbach S. S. Co., 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171; Southern Pacific Co. v. Jensen, supra.

With respect to the rights and liabilities of the parties, there can be no question that they are governed by the law announced in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. In that case the Supreme Court of the United States held that the obligation of seaworthiness, traditionally owed by an owner of a ship to seamen extends to a stevedore injured while working aboard the ship. The court in speaking of that obligation, said at pages 94, 95, of 328 U.S., at page 877 of 66 S.Ct., 90 L.E.D. 1099: "It is essentially a species of liability without fault, analogous to other well known instances in our law. Derived from and shaped to meet the hazards which performing the service imposes, the liability is neither limited by conceptions of negligence nor contractual in character. (Citing cases.) It is a form of absolute duty owing to all within the range of its humanitarian policy". Therefore all the plaintiff is required to show, in order to recover in this action, is that the S. S. Robin Tuxford or her appliances was unseaworthy. However, the plaintiff has failed in this requirement.

The plaintiff contends that the finding that the fall at the No. 1 hatch of

---

[8] A contrary result would be reached if the test for determining whether a statement of claim presents a new cause of action used by the Pennsylvania Courts were applied. See Miners' Savings Bank v. Naylor, 342 Pa. 273, 280, 20 A.2d 287.

[9] For an excellent illustration of a right "rooted" in the state law which is enforced by the maritime law, see The H. S. Inc., No. 72, 3 Cir., 130 F.2d 341.

the S. S. Robin Tuxford was unseaworthy is inescapable because (1) it parted at a point on its vertical portion 10 or more feet below the peak of the boom, and not at a point over the sheave of the block, and (2) the only weight placed upon the fall was the hatch covers, which weighed 8,000 pounds, whereas allowing for a margin of safety, the fall should have been able to support at least 10,000 pounds. In support of her first reason, the plaintiff points out that the maximum stress upon a loaded cable, as used in this case, is at that portion which goes over the sheave of the block. It is perhaps true that when a steady traction is applied to a cable which gradually exceeds the tensile strength of the cable, it will break, assuming that it is of equal strength throughout its length, at a point over the sheave of the block. But in the instant case, a steady traction was not applied to the ship's fall. On the contrary, a sudden shock load was placed upon it. Under these circumstances, we cannot say that merely because the fall parted elsewhere than at a point over the sheave of the block, that it broke because of progressive failure. It would seem that the equally or more logical conclusion would be that the sudden tension placed on the fall caused a large amount of stress to be placed in the vertical portion of the fall, producing a highly localized stress at the point where it parted. If the traction or load had been slowly and steadily applied, the stress would have been distributed throughout the length of the fall and some of it taken up by the elastic or shock-absorbing nature of the boom and its supporting topping lift. By reason of the many variable factors which enter into a problem of this nature it is almost impossible to rely on the proposition pointed out by the plaintiff. In fact it is because of the impossibility of pre-determining the behavior of wire cable under large shock loads, that specifications for this type of material never include minimum requirements for their behavior under these conditions.

In answer to plaintiff's second reason, when a cable lifts a load, the stress caused by the load is not the only one placed upon the cable. There are others. One of these, which is of great importance, is the stress caused by the change in speed or velocity which the cable undergoes in lifting or lowering loads. This stress set up by reason of the change in velocity (acceleration or deceleration) is sometimes referred to as dynamic stress.[10] That is, the force or the stress placed upon the cable equals the product of the mass of the load and its acceleration. Thus if the acceleration is large it follows that the stress or tension placed upon the cable must be large. In the instant case, the hatch covers would take but a few seconds to fall from the vertical position to the hatch coaming, the acceleration of the falling covers, due to the force of gravity, constantly increasing with the fall until they would come to rest. The inference that the product of the acceleration due to the falling covers and the upward motion of the fall (cable) and the mass of the hatch covers caused a dynamic stress of a magnitude in excess of that for which the fall was intended to be used by the vessel owner has not been eliminated. It was not shown what the angle was between the covers and the coaming or the speed with which the fall was being hoisted at the time the fall parted. Therefore this court cannot find that the dynamic stress placed upon the cable was not in excess of the breaking strength required of the cable. We repeat, the mere fact that the fall parted when and where it did is not of itself an indication that it broke because of progressive failure. If the cable had a weak point, it must have been shown, or that the only reasonable inference would be, that it was of such a degree that the cable could not meet the minimum standards required of a cable for the particular legitimate purpose to which it was

---

10 "The stress set up in a wire rope by reason of change of velocity is known as dynamic stress. Such stress may be produced by starting a load from rest at high speed, sharply accelerating a slowly moving load, or by suddenly slowing down or stopping altogether a load being lowered by its own weight". Knight's Modern Seamanship (10th Ed. Rev.1941), p. 62.

intended to be used.[11] The cable in this case was not intended to be used to intercept the fall of the hatch covers.

Orders may be prepared in accordance with this opinion.

---

[11] For a case involving injuries sustained as the result of the breaking of a wire rope, see the illuminating discussion of Circuit Judge Biggs in Mannsz v. Macwhyte Co., et al., 3 Cir., 155 F.2d 445.