**ANDRADE v. UNITED STATES et al.**
Adm. No. 1747.

United States District Court,
D. Rhode Island.

Sept. 13, 1950.

Joseph A. Caulfield, Francis D. Harrigan, Boston, Mass., for libellant.

Harold R. Semple, Providence, R. I., Thomas H. Walsh, Boston, Mass., for libelees.

HARTIGAN, District Judge.

This is a libel in personam which was filed against the United States of America by Elizabeth Andrade, Administratrix of the estate of John Andrade. It alleges in substance that the ocean freighter John S. Copley, then known by the Navy designation XN-379, was tied up at Davisville, Rhode Island, within the limits of the Quonset Naval Base and was then and there loading cargo from the wharf; that the vessel was owned and operated by the United States or on its behalf by the War Shipping Administration and was manned by a crew employed by the United States; that the vessel was in an unseaworthy condition in that the loading equipment, including steam-winches and boilers used to supply steam to the winches were in a defective condition and that by reason of which the steam winches used to operate a boom hoisting cargo failed to hold the cable raising the boom, the cable ran off the winch and the boom crashed to the deck; that by reason of the negligence in various respects of the crew, including engine room personnel, the cable ran off the winch and the boom crashed to the deck; that by reason of unseaworthy condition of the vessel and its tackle, a boom hoisting on board a load of cargo crashed to the deck; that on August 27, 1945, John Andrade was working as a stevedore in the employ of Geo. Fuller, Inc., a concern hired as stevedores to load cargo; that John Andrade who was at all times in the exercise of due care, was on the said vessel at his station near No. 1 hatch and was struck by the said falling boom and that he died as a result of the injuries so inflicted after suffering 31 days; that John Andrade was married with three minor children who were all dependent on him; that the General Laws of Rhode Island, Revision of. 1938, Ch. 477, § 1 provides a right of action for death caused under the circumstances set forth, and that the United States of America assumed liability and has consented to suit by reason of the Suits in Admiralty Act, Title 46, U.S.C.A. §§ 741, 742 and the Public Vessels Act, Title 46, U.S.C.A. §§ 781, 782.

The United States made answer to the libel and after certain admissions and denials, alleges in substance that the United States denies that it has assumed liability under the statutes referred to; that at the time the libellant was injured he was in the employ of an independent contractor and not in the employ of the respondent; that if he was injured as alleged it was due in whole or in part to the libellant's own negligence or due to the negligence of the supervisors or superiors in the employ of the independent contractor and not in the employ of the respondent; that at the time Andrade was injured he and his fellow servants were in the process of rigging the boom at No. 1 hatch with no member of the crew or officers of the vessel assisting in performance of this work; that the stevedores all in the employ of the independent contractor through their negligence failed to properly handle the tackle and equipment, causing the boom to fall.

On motion of the respondent United States, the George A. Fuller Company and Merritt-Chapman and Scott Corp. were interpleaded in that they were the employers of John Andrade and that these two companies were working under an independent stevedoring contract with the respondent, United States, to load and discharge cargo from the Copley which was owned by the United States while it was at the port of Davisville.

The answer of George A. Fuller Company and Merritt-Chapman and Scott Corp. admits the allegations of the libel but in answer to the allegations of the petition of the respondent, the United States of America, to interplead, they make various admissions and denials but leave the petitioner to its proof.

The libellant contends "that the accident was caused by an unseaworthy condition of the vessel, a condition of the winch such that a serious leak developed and, therefore, the boom then being held steady by Monteiro (the winchman) slipped. The pull of the cable under the weight of the boom caused the niggerhead to reverse and the men on the free end of the cable were pulled in and had to let go because of danger to themselves by the force of the drag and that, thereafter, the falling boom fell free by reason of the release of the cable from the niggerhead."

The respondent contends that the ship and specifically the winch were seaworthy and that the leak in the winch was not serious.

Clarence O'Connor, chief engineer of the Copley, testified in substance that about 8 a. m. on the morning of August 27, 1945, all the 5 hatches were in operation; that the steam pressure on the deck necessary to operate 5 hatches was 125 pounds which is a safe pressure to hold a boom in any position and that there was sufficient steam pressure on that morning.

He further testified that after the accident he received no report of a steam leak and received no notice of any unusual condition of the number 1 winch.

Edward H. Brennan testified that he was a stevedore foreman employed by George A. Fuller Company and Merritt-Chapman and Scott Corp., that he had approximately 27 years experience; that work was started to rig the boom as it was not in a proper position; that he had the winchman get in place and that he made 7 or 8 turns of cable around the niggerhead; that he got 3 or 4 men and told them to hold the cable "as it is and the winchmen gave slack in the chain as when I got the shackle off there a little bit, the winchmen come down on their winch a little bit, relieve a little steam so as to relieve the boom or pressure so that I could take off the shackle. Then I was to go ahead up with it—boom—so I could raise that in position."

He testified he had a gang of men that day with whom he had no experience. His testimony in regard to leaking steam from the winch was not clear or convincing.

On August 27, 1945, he made a report of the accident and he did not say anything about a leak of steam.

He also testified that it was not unusual to see a little steam coming out of the

172

gland at the valve and that he did not investigate the winch.

Joseph R. Monteiro, a winchman with 7 or 8 years experience and a longshoreman for 12 years, and the operator of the winch in question, testified that he wanted to top it (the boom) "a little more." He testified to the operation of the winch and boom; that he was on the winch and took up the slack and the cable until there was a strain on him; that he took up the slack by the winch throttle giving it steam; that Brennan unhooked the chain and Reid and Martin were holding the cable and while they were holding it there was a little leak in the winch and "before I could check it, naturally, they let go of the cable and jumped off the drum."

In cross-examination he testified that he checked the winch to see that it was in working order and it appeared to him that there was no leaking of steam that was unusual or different from that on any winch.

The testimony of Einar Gunnerson for the libellant did not impress me favorably.

Frank W. Pote, a professor of physics at Tufts College for 37 years, testified as an expert for the libellant. He testified: (R. 178, 179, 211, 212)

"19 Q. Have you an opinion as to whether or not it is proper to have a winch in such condition that the steam comes out through the so-called glands— leak of packing? A. Well, they always leak a little bit in operation but, usually, they are in such condition that the leak is very small and inconsequential.

*    *    *    *    *    *

"149 Q. In other words, will you agree that on the normal steam-operated winch or any other steam plants, such as locomotive, that there is inclined to be a normal amount of leaking from the packing or pistons, or in some places? A. Well, there is always a—There is generally always a little leak in a machine that has been operated.

*    *    *    *    *    *

"154 Q. And isn't it accepted practical construction and operation, to have that—

if there is a little bit of steam leaking out in good operation? A. It is difficult to avoid any leak whatever.

"155 Q. You don't recommend it, do you, in the actual operations of steam plants or steam engines that every little bit of a leak be avoided? A. From a practical point of view, it is almost impossible to stop it all."

Frank Martin, one of the crew of stevedores at the No. 1 hatch, was called as a witness for the libellant and testified: (R. 247, 248, 270, 271, 272)

"42 Q. When you saw the winch operator doing that, did you notice anything else around the winch? A. He seemed to be right in steam there. It was hot. Usually, when the winch has been working good, you can see him very plain and he wasn't so plain around his feet.

"43 Q. What was around him that you couldn't see him? A. Steam. That is the only peculiar thing I noticed.

"44 Q. When that winch started to reverse, what did you notice Mr. Reid do, who was holding the cable? A. It was just too bad. He was trying to hold it; he couldn't. All of a sudden, the boom came down, pulled him in towards me. I had to pull out quick or we both would have gotten tangled up in the cable.

*    *    *    *    *    *

"205 Q. How much steam did you see around there? A. Quite a little.

"206 Q. How much? Were you in it, in the middle of the steam? A. No, but I was surrounded like.

"207 Q. How far up? A. Quite a little. The only way I could see there was something wrong, the thing wasn't holding, it wasn't clear like it usually be when you have a good winch. That is the only thing I noticed.

"208 Q. You have seen a lot of winches? A. That is right. The steam shoots out and it disappears and it is pretty clear around the winchman, but that special occasion it happened to be around him.

"209 Q. This steam wasn't coming out with any force? A. No, it wasn't coming out like it usually does otherwise.

"210 Q. Just trickling out? A. Yes, and right from the beginning I figured the winch wasn't holding that thing.

\* \* \* \* \* \*

"215 Q. You told us that you knew he was having trouble when you started in but you didn't say anything to Brennan about it, did you? A. No, when I got there, everything was set up. This happened all of a sudden. This wasn't a long time of space. It was only three or four minutes before this happened. First thing you know, the whole thing shot by. It went in reverse; that is all there is to it."

Martin impressed me as a witness inclined to exaggerate his testimony in order to help his fellow stevedore, Andrade.

Raymond H. Terry, who was familiar with steam operated winches, testified in cross-examination: (R. 304, 305)

"129 Q. From your experience, is there generally a certain amount of steam which is considered a normal leakage of steam from a winch? A. There is apt to be a minute seepage.

"130 Q. Well, it is a noticeable seepage, isn't it? A. Well, it is barely so.

"131 Q. It trickles out of the valves and around the packing. Isn't that so? A. That is correct."

Frank Moritz, the chief mate of the Copley, testified for the respondent that he received no report of leakage of steam in the winch.

Thomas Barry, a shipping engineer surveyor with many years experience, testified that a normal leakage does not affect the winch and that the winchman could use the brake to hold the boom provided it was efficient and that the steam would have no effect.

Hugh Rayhill, the second assistant engineer, testified that he kept watch over the machinery during the night and that at 7 a. m. on the morning of August 27th he turned on the steam on the deck for the winches; that there was 125 pounds on the line and that there was pressure on the boilers of 250 pounds.

Horace L. Mathews, the second engineer, testified that he went on watch at 8 a. m. in the engine room; that there was about 220 pounds pressure on the boilers and 125 pounds pressure on deck on August 27th; that there was no breakdown on the boiler or sudden change in pressure that morning and that he received no notice of loss of steam that day.

Angelo Andreozzi, the deck engineer, testified that he received no complaint from anybody about the operation of the winch; that the boom was later renewed; that the winch was used to unload cargo and that no repairs, alterations or changes were made in the winch. (R. 409)

Clarence O'Connor was recalled by respondent and testified that on August 27th he did not receive any notification from any one of any unusual condition in regard to the No. 1 starboard winch.

A statement of Reid, a stevedore (now deceased) made on August 27th makes no mention of a leak of steam in the winch. Ex. B.

In Shelton v. Seas Shipping Co., D.C., 75 F.Supp. 195, 201, the court said: "With respect to the rights and liabilities of the parties, there can be no question that they are governed by the law announced in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. In that case the Supreme Court of the United States held that the obligation of seaworthiness, traditionally owed by an owner of a ship to seamen extends to a stevedore injured while working aboard the ship. The court in speaking of that obligation, said at pages 94, 95, of 328 U. S., at page 877 of 66 S.Ct., 90 L.Ed. 1099: 'It is esentially a species of liability without fault, analogous to other well known instances in our law. Derived from and shaped to meet the hazards which performing the service imposes, the liability is neither limited by conceptions of negligence nor contractual in character. (Citing cases.) It is a form of absolute duty owing to all within the range of its humanitarian policy'. Therefore all the plaintiff is required to show, in order to recover in this action, is that the S. S. Robin Tuxford or her appliances was unseaworthy. \* \* \*"

174

I find that the respondent exercised due and reasonable care with respect to the condition of the John S. Copley and her equipment.

I find on the credible testimony that the John S. Copley and her loading equipment, including steam winches and boilers used to supply steam to the winches were not unseaworthy on August 27, 1945.

Judgment may be entered for the respondents.