## GALLOWAY v. FISH PRODUCTS CO.

### No. 6328.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 18, 1951.

Decided Oct. 31, 1951.

Wallace C. Murchison, Wilmington, N. C., for appellant.

Martin J. McHugh, New York City, and George Rountree, Jr., Wilmington, N. C. (Macklin, Speer, Hanan & McKernan, New York City, and Rountree & Rountree, Wilmington, N. C., on brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is an appeal from an admiralty decree of the United States District Court for the Eastern District of North Carolina. Appellant sought to recover damages under the Jones Act, 46 U.S.C.A. § 688, for the death of her intestate husband due to the alleged negligence of the Captain of the Barnegat, a vessel owned and operated by the appellee.

On August 3, 1949, the Barnegat set out from Crab Island, New Jersey, to fish for menhaden. The Barnegat carried two small gasoline powered boats known as "purse" boats. She was also equipped with a crow's nest located on the mast some fifty feet above the deck. From this vantage point the Captain searches for fish. Once a school is sighted, the two "purse" boats set out with large seine nets. When these boats approach the fish, they part, and the seine nets are let out between them. The "purse" boats continue to maneuver until the fish are completely circled by the nets. The nets are then closed or "pursed" at the bottom, and the men draw them to the surface. The mother ship comes alongside and with a bailing net attached to a boom and tackle, scoops the fish out of the seine nets. This complete operation is known as making a set.

On the day the accident here in question occurred, the Barnegat had already made two sets, when the Captain sighted from the

crow's nest another school and ordered the men into the "purse" boats. The Captain testified that before leaving the crow's nest, he noticed a dark cloud over the mainland some ten to fifteen miles from the Barnegat. He further testified, however, that he did not believe foul weather was immediately impending.

The "purse" boats set out to make the set with the Captain in command of one boat and the Mate in command of the boat in which appellant's intestate was working. When the set had been in progress some thirty-five to forty-five minutes, the Captain observed a bolt of lightning from a cloud between the ship and the shore. This first flash was followed very shortly by a second bolt which struck and killed appellant's intestate. Upon these facts, the District Court determined there was no negligence on the part of the Captain.

■ It is well established that for a seaman to recover under the Jones Act, negligence must be proven. See, West v. Eastern Transp. Co., 4 Cir., 179 F.2d 478; Branic v. Wheeling Steel Corp., D.C., 152 F.2d 887; Armit v. Loveland, 3 Cir., 115 F.2d 308. Since the question of negligence was decided against appellant by the District Court, we are not free to reverse that finding unless it be clearly erroneous.

As to whether there was an impending storm at the time the Captain ordered the "purse" boats out, the evidence is conflicting. Several members of the crew testified that there was thunder and lightning at the time the boats left the Barnegat. The Captain, however, testified on this point:

"Q. When you spotted the school of fish upon which you were 'making a set' at the time of Galloway's death describe the weather condition. A. It was pretty weather, no wind.

"Q. Had there been any wind that day? A. None to speak of.

"Q. What was the condition of the skies and clouds at the time you set the purse boats over the side? A. It was cloudy but I hadn't seen any lightning.

"Q. Had you seen any particular storm cloud? A. One that might be a summer squall over the beach ten or fifteen miles from us.

"Q. To your westward? A. Yes, sir.

"Q. You mean into shore? A. Yes, sir.

"Q. Between you and the shore? A. No, sir, over the land.

"Q. Was there any reason at the time you saw these particular clouds to anticipate an immediate storm? A. No, sir, but I wouldn't have dropped off to have gone out and catch a bunch of fish. I don't want to put anybody in danger. Purse boats are not too large."

As to whether the Captain was mindful of the dark cloud once the set was begun, he further stated:

"Q. You were not giving your attention to it? You were busy with your fishing? A. I always pay attention to the weather when I am fishing. I have to.

"Q. You say you don't know whether this squall was going away or coming closer or what was happening? Did you see the dark clouds coming over you? A. I saw the dark clouds but didn't see it coming over us until it hit us.

"Q. Isn't it true you could see lightning and hear the thunder when you went out, that you could have seen lightning and heard thunder some little time before you went out on this set? A. I didn't.

"Q. It was thundering and lightning? A. If it was I didn't hear it."

This testimony of the Captain was strengthened by the testimony of Charles Frink, the cook on the Barnegat, who stated that he observed no lightning until the men were engaged in making the set.

The Captain also pointed out that other menhaden fishing vessels in the area had their "purse" boats out at the time this accident occurred. There was evidence, however, that the Brigantine, a sister ship of the Barnegat, did not send out its boats because of the approaching squall.

The evidence shows that the Captain had been engaged in fishing for some thirty years and it is not reasonable to believe he would allow his son, who was a member of the crew of the Barnegat, to go out, and

himself to command one of the "purse" boats if he believed a storm was impending.

In view of the conflict in the evidence, which we have carefully reviewed, as to whether the Captain was acting as a reasonably prudent man in sending out the "purse" boats, we cannot reverse the District Court. That Court evidently believed the Captain rather than the seamen, and we do not, therefore, feel that the decision below was clearly erroneous. That decision finds ample support in the District Judge's findings of fact.

For these reasons, the decision of the District Court is affirmed.

Affirmed.