**Joseph A. WEHE**

v.

**UNITED STATES of America.**

No. 481 of 1952.

United States District Court
E. D. Pennsylvania.

May 9, 1955.

W. Wilson White, U. S. Atty., Krusen, Evans & Shaw, Philadelphia, Pa., of counsel, for respondent.

Dorfman & Pechner, Philadelphia, Pa., for libellant.

CLARY, District Judge.

This is an admiralty action by a merchant seaman against the owner of a vessel on which he was employed to recover damages for personal injury sustained while at work aboard the ship, under the provisions of the Jones Act, 46 U.S.C. § 688, and also to recover maintenance and cure. The case was tried by the Court, without a jury, and each counsel has submitted briefs and requested findings of fact and conclusions of law. The Court finds that the record of the case establishes the following.

On September 5, 1951, libellant, a single man, forty-one years of age, joined the Steamship Joseph W. Folk, owned by the respondent, United States of America, as an able bodied seaman with a base wage of $248.50 a month, plus overtime at the rate of $1.22 per hour. He was assigned the 12 to 4 watch and performed his duties satisfactorily. One of his regular assignments, for which he was paid overtime wages, was the disposition of the garbage. Previous to the day of the accident the vessel had made passage through the Suez Canal and there had been an accumulation of garbage in G.I. cans which had been placed on the after poop deck on the port side of No. 4 hatch. The G.I. can containers measured about 30″ high and from 20″ to 22″ in diameter across the top

tapering to a slightly narrower diameter at the bottom. They were made of corrugated, galvanized steel with handles in excess of 3″ wide on opposite sides situated about two-fifths distance from the top of the can. Loaded with garbage the cans weighed upwards of 200 pounds. It was the normal and routine procedure of the vessel to dump the garbage over the rail at a point directly opposite where the cans were stored, a distance of some 150 to 175 feet from the stern of the vessel. Two men were required to properly accomplish this task. The accepted procedure was for one man to take the handle on each side of the can with one hand, use the other hand for support underneath the other, lift the can vertically until it was against the rail, slide the lower hand under the bottom of the can, and then tip the can over the rail to a horizontal position for dumping.

On November 13, 1951, at about 3:30 P.M. while the vessel was in the Mediterranean Sea proceeding towards the Straits of Gibraltar, libellant was instructed by his superior, the boatswain, to assist him in the dumping of the garbage. The regular routine method was observed with one particular can which was raised vertically to the rail and while the libellant and boatswain were in the act of tilting the can, then balanced on its side and resting on the rail, and at a time when the can was slightly above a horizontal line, the boatswain's end suddenly swung free, slid along and over the railing, putting the weight of the can on the libellant and causing him to be pulled up against the rail in a jackknife position, feet off the deck. Libellant retained his grip on the can and, when the garbage gradually dumped out and the weight lessened, he pulled himself back to the deck and recovered the can. The boatswain stated at the time that his hand had slipped. There was no apparent immediate result to the libellant and he continued with his work. However, about an hour later and at a time when he was off duty, he developed pain in his low back and took a hot shower in an attempt to relieve the pain. The libellant worked his next shift during the early morning hours and at about 8:30 A.M. sought relief for his low back pain which he testified was then rather excruciating. In reporting to the Purser libellant stated that he had sprained his back, that it was the second lumbar of the vertebrae and suggested that he lay prone on the deck and have the Purser put his knee in his back and raise his arms in an attempt to throw it back into place, remarking that he "had had this before" and that was the way "to put it back in place". The Purser, who testified in the case and whose testimony the Court believes, very properly refused the requested manipulation, since he was not a physician, reported the situation to the Master of the vessel, and then suggested to the libellant that liniment be applied and the back taped. Libellant replied that he had his own liniment, refused the Purser's offer of either liniment or taping, and resumed his regular duties. Three days later the Purser again offered to assist libellant in any way possible but his offer was refused by the libellant. For the remainder of the voyage the libellant did not return to the Purser nor did he request additional medical care or attention. He made no complaint or request for relief and performed his full and complete duties including overtime work. This work which included slushing down rigging, painting and chipping, was performed without any apparent evidence of physical incapacity or inability. He continued in this manner until the voyage terminated on December 5, 1951, in Baltimore, Maryland, his home city, and he left the vessel without requesting a Master's certificate. He went to his permanent address, his sister's home in Baltimore, Maryland, and made no effort to seek employment.

On December 19, 1951, the libellant sought attention at the Baltimore Marine Hospital, and the records there indicate the presence of moderate muscle spasm, slightly exaggerated spinal curve, but no other defect. Other clinical tests, in-

cluding x-ray examination, produced negative results with a final diagnosis of lumbar strain. He was under active treatment until January 16, 1952. On January 30, 1952, he was discharged as "fit for duty". In order to prevent a possible recurrence of the strain a belt was furnished to the libellant by the Baltimore Marine Hospital and he was told to use it while working but to gradually discontinue its use.

On February 18, 1952, libellant joined the S. S. Steel Recorder as 2nd Electrician and remained aboard until May 2, 1952. While libellant stated he rested at his sister's home in Baltimore, Maryland, until May 18, 1952, when he joined the S. S. Steel Voyager as Chief Electrician, the record indicates that on May 16, 1952, he was examined for purposes of testimony in the case by two Philadelphia physicians, viz., Dr. Jacob Krause for the libellant and Dr. James R. Martin for the respondent, and that on the same day x-rays were taken on behalf of the libellant by Dr. Theodore Meranze of Philadelphia and on behalf of the respondent by Dr. Jacob H. Vastine of Philadelphia. Libellant testified he left the vessel on May 23, 1952, because of aggravation to his back caused by activities on the vessel, which testimony the Court finds not to be in accordance with the true facts. Libellant took no further action to receive medical attention until June 3, 1952, when he returned to the Baltimore Marine Hospital and remained there in an outpatient status until September 19, 1952. The Marine Hospital gave him another intensive course of physiotherapy treatments, a series of exercises, injected procaine, fitted him with a new steel back brace, and sent him to a psychiatrist. The psychiatric examination revealed personality problems indicating passive-aggressive personality, passive-dependent type. An important note of that examination states, "This man presents difficulties in the passive-aggressive sphere, this basic personality pattern finding simultaneous satisfaction in his passively accepting not working and in his aggressive hostile feelings towards doctors and people in general who present obstacles to him." Another significant note in the hospital record, upon his return to the hospital in June, reads as follows: "6/18/52 Returns following 2 weeks of physiotherapy. Pt. feels that backache is not improving. Pt. is of the opinion that he has a disc syndrome on basis of x-ray & opinion of a doctor in Philadelphia. Has a lawsuit pending and therefore it is doubtful Pt. will ever improve. Findings lds. unchanged from that noted on last 2 visits." Upon being discharged from the hospital on September 19, 1952, for approximately two weeks he took a relief job on the excursion vessel Tolchester and then did not work until December 27, 1952, when he shipped as an able bodied seaman on the S. S. Lone Jack. He has worked regularly since that time. Libellant claims, however, despite the fact that he has passed many pre-sign-on physical examinations, at which he made no complaints of his back pains, that for all of the periods when he was not actually at sea, the interim periods of inactivity were caused solely and exclusively by the accident of November 13, 1951, which testimony the Court likewise finds not to be a fact.

As to the medical aspect of the case, libellant's examining physician, Dr. Jacob Krause, made an original diagnosis of a ruptured intervertebral disc at the lumbo-sacral joint space with lumbo-sacral instability. On his two subsequent examinations he changed the diagnosis to a degenerating intervertebral disc rather than a ruptured intervertebral disc. On the other hand, Dr. James R. Martin, who examined him on behalf of the respondent, and Dr. A. M. Ornsteen, a neurologist, who examined him on October 3, 1952, made a diagnosis of a strain of the lumbo-sacral point. After hearing the medical testimony of both sides, the Court has reached the conclusion that the respondent's evidence is more worthy of belief and that the only injury suffered at the time of the accident was a strain of the lumbo-sacral area. There was no rupture or degeneration of the intervertebral disc and all of the symptoms complained of by the libel-

lant are referrable only to the lumbosacral strain.

On the question of liability the Court finds in favor of the libellant on the grounds of negligence only. At the trial libellant advanced other theories of liability. Among these were that the respondent failed to furnish the libellant with a reasonably safe place to work, that there was a failure by the boatswain to warn the libellant that the garbage can would swing free, and that the method of doing the work was improper. As to the latter contention, libellant introduced evidence that there is another way or safer method of disposing of garbage by means of an appliance which, mechanically operated, permits one man to dump garbage overboard. This appliance is used only at the stern of the vessel and is ordinary equipment only on tankers where the mess hall is situated at the stern of the vessel. While it has been used on some Liberty ships, particularly on the West Coast on vessels engaged in coastwide trade, ordinarily it is not standard equipment on Liberty ships. The Court finds from the evidence that the garbage disposal equipment furnished was customary, safe and proper equipment and that the method of disposal used was the ordinary and accepted method on Liberty ships. There was nothing in the evidence which would warrant a finding that the containers used were either in poor condition or were not adequate for the intended purpose. It appears to the Court that disposing of garbage over the side of the ship by walking 8 feet instead of up to 175 feet to the stern is merely the exercise of good common sense and nothing in the libellant's case established that the method used, in vogue for many years, had ever proved other than a safe method. As for the failure to give warning by the boatswain, the facts speak for themselves. It was an unexpected event which happened in a split second without any possibility of warning. However, the Court can only conclude that the accident happened because of negligence on the part of the boatswain. Clearly, he did not have a proper grip on the rather heavy garbage can. As a reasonable person he should have known that failure to make sure he did have a proper grip in lifting a 200 pound G.I. can would permit it to swing free and cause it to either fall on his companion worker or, as happened in this case, swing free and put undue stress and strain on his fellow worker. He was, therefore, guilty of lack of care. Proof of negligence is a fundamental requirement to recovery in an action under the Jones Act. Beadle v. Spencer, 1936, 298 U.S. 124, 56 S.Ct. 712, 80 L.Ed. 1082; DeZon v. American President Lines, 1943, 318 U.S. 660, 63 S.Ct. 814, 87 L.Ed. 1065; Becker v. Waterman S. S. Corp., 2 Cir., 1950, 179 F.2d 713; Buford v. Cleveland & Buffalo S. S. Co., 7 Cir., 1951, 192 F.2d 196, and Galloway v. Fish Products Co., 4 Cir., 1951, 192 F.2d 314. The libellant has met this burden by what the Court considers a fair preponderance of the evidence.

Respondent has strenuously contended that in order to find negligence the Court must apply the doctrine of res ipsa loquitur and cites in support thereof the case of Rosenquist v. Isthmian S. S. Co., 2 Cir., 205 F.2d 486, 489. The facts in that case completely distinguish it from the instant case and the rule there stated is not applicable. The Court feels that the libellant has established sufficient facts from which negligence can be found and so determines as a question of fact. The Court finds no unseaworthiness in the vessel and, of course, no contributory negligence on the part of the libellant.

The question of the amount of damages to be awarded the libellant, both in the maintenance and cure action and in the liability action, in view of the finding of negligence, presents several serious difficulties. The Court has found that the libellant sustained only a lumbosacral strain with resultant low back pain. While the libellant did not have a back which was normal, in the usually accepted sense of the word, since he had had previous trouble with his back, there is nothing in the evidence to warrant a finding that at the time of the injury it

was giving him any trouble. The injury sustained was of a type which, under normal circumstances, should have been cured within a relatively few months. The libellant was a victim of a wrong diagnosis by his own physician. His thinking with respect to the extent of his injury was influenced to a marked degree by the wrong diagnosis of his own examining physician. The testimony indicates that from the time of the accident down to the present time the libellant could have worked at any time if, as he stated, "he had to". There is no doubt that his leaving the vessel on May 23, 1952, was occasioned primarily because of the diagnosis made, as aforesaid, by his own examining physician on May 16, 1952. It should be noted at this time that the physician who examined libellant was selected by his own attorney and was for the purpose of examination, diagnosis, and testimony as to the extent of the injury and for the purpose of establishing the measure of damages in the case. That fact raises the problem as to whether or not there has been an intervening cause of any further disability, and whether or not the further hospitalization was the result of a cause independent of the accident and for which the respondent would not be liable. Finding as I have, however, that the libellant was injured as a result of the negligence of the respondent, it cannot be said that such examination and diagnosis was other than a reasonable foreseeable result of the negligence. The duty of the libellant and his attorney involved only reasonable care in the selection of a physician or surgeon to examine the libellant, diagnose his injury, and establish his real loss. That his injury psychically was aggravated by the wrong diagnosis is in the opinion of the Court, in view of the selection of a competent physician, a part of the immediate and direct damage naturally flowing from the original injury. 15 Am. Jur., Damages, Section 85, p. 495. See Wallace v. P. R. R., 1909, 222 Pa. 556, 71 A. 1086; Thompson v. Fox, 1937, 326 Pa. 209, 192 A. 107, 112 A.L.R. 550. As a result of his thinking, influenced by the wrong diagnosis, libellant submitted himself for further treatments at the Marine Hospital in Baltimore. Under the circumstances, I find that he was justified in seeking this treatment. Therefore, I hold that it was not unreasonable on the part of the libellant to submit himself for outpatient treatment at the hospital on the occasions above set forth and he is entitled to maintenance and cure on both occasions and until he was discharged as "fit for duty". I do not, however, find that at any time as a direct result of this injury the libellant suffered "excruciating" pain so as to prevent him from attending to his ordinary duties. There is no doubt in my mind, as testified to by Doctors Martin and Ornsteen, that he did sustain a lumbo-sacral strain with resultant annoying but nondisabling low back pain. These results were aggravated in some degree by the neurotic tendencies evidenced in the record of the Baltimore Marine Hospital. The award in damages will reflect the value of the pain, suffering and inconvenience endured by him as a direct result of the injury sustained in the accident of November 13, 1951.

The evidence has established that libellant reached maximum medical improvement on September 19, 1952 and after that date he is not entitled to further maintenance and cure. The libellant, therefore, will be awarded maintenance and cure from December 5, 1951, to January 30, 1952, and from June 3, 1952, to September 19, 1952. The award of damages will include loss of wages up to September 19, 1952, occasioned by the accident, and compensation for pain and suffering, which he sustained as a direct result of the accident, past, present and future. The libellant will, therefore, be awarded in the action for maintenance and cure the sum of $1,312, and in the liability action the sum of $4,000.

The foregoing findings of fact and conclusions of law may be taken as the Findings of Fact and Conclusions of Law of the Court. In the event of any minor variation in the requested findings and conclusions, the statements of the above opinion will govern.

The Court affirms Libellant's Requests for Findings of Fact Nos. 1 to 11, 12 (eliminating the word "excruciating"), 13, 15, 17, 19, 20, 25, 27, 28, 30, 31, 40, 41, 42, 43 and 44.

The Court denies Libellant's Requests for Findings of Fact Nos. 14, 16, 18, 21, 22, 23, 24, 26, 29, 32 to 39 inclusive, and 45 to 50 inclusive.

The Court affirms Libellant's Requests for Conclusions of Law Nos. 1 to 7, inclusive, 9, 10 and 13.

The Court denies Libellant's Requests for Conclusions of Law Nos. 8, 11, 12, and 14 to 16 inclusive.

The Court affirms Respondent's Requests for Findings of Fact Nos. 1 to 7 inclusive, 8 (eliminating the words "and he fully recovered therefrom prior to his departure from the vessel"), 9, 10 (eliminating the first sentence thereof), 11 to 20 inclusive, and 23.

The Court denies Respondent's Requests for Findings of Fact Nos. 21, 22, 24 and 25.

The Court denies Respondent's Requests for Conclusions of Law Nos. 1 to 6 inclusive.

An appropriate order will be entered.