Seymour **HAMILTON**

v.

**MARINE CARRIERS CORPORATION.**

**Civ. A. No. 70–2261.**

United States District Court,
E. D. Pennsylvania.

Sept. 25, 1971.

Morris M. Shuster, Philadelphia, Pa., for plaintiff.

Robert B. White, Jr., Philadelphia, Pa., for defendant.

## OPINION AND ORDER

MASTERSON, District Judge.

This action was instituted by Seymour Hamilton, a seaman, to recover damages from defendant, his employer, under the Jones Act,[1] and general maritime law as a result of an accident which Hamilton sustained on February 20, 1969.

Hamilton contends that defendant is liable to him for personal injuries which he claims were caused by (1) the negligence of the defendant and/or his agents and (2) the unseaworthiness of defendant's vessel. Defendant has filed a motion for summary judgment which is presently before this court. For purposes of the motion, we will consider plaintiff's version as an accurate reflection of the events surrounding the accident.

On February 20, 1969, plaintiff while in the employ of defendant as a crew member on the SS Commander was injured when he stepped into an ice covered hole on a dock at Westhaven, Holland. The vessel which sailed from Philadelphia had been berthed at the dock for three days for the purpose of discharging a cargo of coal onto floating barges. The Port Authority of Amsterdam owned the dock and defendant exercised no control over it.

From the time the ship arrived at Westhaven to the day of the accident,

---

1. 46 U.S.C. § 688.

intermittent rain and snow fell and covered the pier, except for certain areas where a crane was located and where vehicles had worn down the snow. During this period, the ship's master, James W. Wood, went ashore approximately four times. Each time he inspected the dock area for dangerous conditions.

In order for a crew member to leave the pier area where the Commander was berthed and reach the public highway, it was necessary to pass through a guarded gate which was located about one-half mile from the vessel's gangway. This was the only available general route to travel from the vessel to the public highway. Throughout this half mile distance, the dock was approximately sixty feet wide and there were specific "widths" in the pier which one could follow to reach the gate.

On the date of his accident, plaintiff assumed the responsibilities of a "day worker" which means that he could have been assigned a job by the Chief Mate or Boatswain from 8 A.M. until 4 P.M. Plaintiff, however, did not receive an assignment, so he decided to go into Amsterdam for personal reasons.

While in Amsterdam, plaintiff bought some items, ate lunch and then returned to the pier in a taxi cab with the ship's steward. After leaving the taxi cab at the gate, plaintiff and the steward walked down the pier toward the SS Commander. While walking, plaintiff stepped onto an area of the road which appeared to him to be solid, but which gave way under plaintiff's weight causing him to fall on his face. He had stepped onto a pothole which the snow had concealed. The pothole was located approximately 250 to 300 feet from the gangway of the SS Commander. After his fall, plaintiff was taken to a hospital in Amsterdam where he was treated for a fractured left ankle.

2. 46 U.S.C. § 688.

3. See DeZon v. American President Lines, 318 U.S. 660, 63 S.Ct. 814, 87 L.Ed. 1065 (1943); Beadle v. Spencer, 298 U.S. 124, 56 S.Ct. 712, 80 L.Ed. 1082

Prior to the accident, plaintiff had gone into Amsterdam on two occasions. Both times he used the same route as the one used on the day of the fall.

At no time did the ship's master order or request any crew member to shovel a path from the vessel to the gate even though the ship had shovels aboard. Nor did he request the pier owner or stevedore personnel to clear a path. Captain Wood never gave any instructions to the crew that they were to walk on a particular area of the dock. Nor did he inquire as to the nature of the dock's surface.

For the reasons set forth below, defendant's motion for summary judgment will be denied as to both theories of liability advanced by the plaintiff.

## I. LIABILITY UNDER THE JONES ACT

### A. NEGLIGENCE OF DEFENDANT'S AGENT

 In part, the Jones Act provides:

"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply * * *"[2]

There is no question that plaintiff was a seaman and that his shore activities fell within the scope of his employment as required by the Act. See, e. g., Aguilar v. Standard Oil of New Jersey, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1942). Under the Act, the gravamen of a seaman's action for personal injuries occurring in the course of employment is negligence.[3] And in Hopson v. Texaco, Inc., 383 U.S. 262, 86 S.Ct. 765, 15 L.Ed.

(1936); Armit v. Loveland, 115 F.2d 308 (3rd Cir. 1940); Wehe v. United States, 130 F.Supp. 768 (E.D.Pa.1955). See generally, Gilmore & Black, Admiralty, § 6-3 (1957); 2 Norris, The Law of Seaman, 844 (2nd Ed. 1962).

2d 740 (1965) (per curiam), the Supreme Court explained that "The Jones Act incorporates the standards of the Federal Employers' Liability Act, as amended, which renders an employer liable for the injuries negligently inflicted on its employees by its *'officers, agents, or employees.'* " (emphasis added).[4] See 45 U.S.C. § 51.

In this case, plaintiff asserts that he is entitled to recover from the defendant for the negligence of the Port of Amsterdam. This question raises two subsidiary issues: (1) was the Port of Amsterdam which owned the pier an agent of the defendant, and (2) if so, did the agent act negligently toward the plaintiff?

As to the first issue, plaintiff relies upon Carter v. Union Railroad, 438 F.2d 208 (3rd Cir. 1971). In *Carter*, a railroad employee brought an FELA action when he was injured while walking on property owned by General Motors Corporation en route to the job site of his employment with the railroad. Carter was part of a railroad crew whose daily starting point was a shanty located next to the tracks at a General Motors plant. The railroad had contracted with General Motors for its crew members to park their cars on GM's lot and thereafter traverse a dirt road that led to the shanty. Carter suffered injuries when he slipped on the muddy path. On these facts, the court reversed the lower court's directed verdict and held that Carter was entitled to a jury determination of the railroad's negligence on two distinct theories of liability.

First, the court determined that General Motors was the statutory agent of the railroad and hence responsible under that part of the Federal Employers' Liability Act which renders employers liable for the negligence of their "agents." We will consider the second basis of liability in connection with the alleged negligence of the defendant in failing to furnish plaintiff with a safe place to work. See Section IB, *infra*.

To support the conclusion that Carter's employer was liable for the negligent acts of General Motors, the court relied upon the *Hopson* case where the Supreme Court stated:

"We noted in Sinkler v. Missouri Pac. R. Co., 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed.2d 799, that the latter Act was 'an avowed departure from the rules of the common law' (id., at 329, 78 S. Ct. 758), which, recognizing '[t]he cost of human injury, an inescapable expense of railroading,' undertook to 'adjust that expense equitably between the worker and the carrier.' Ibid. In order to give 'an *accommodating scope* * * * to the word "agents" ' (Id., at 330–331, 78 S.Ct. 758), we concluded that 'when [an] * * * employee's injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are "agents" of the employer within the meaning of § 1 of FELA.' " (emphasis added) 383 U.S. at 263–264, 86 S.Ct. at 766. 15 L.Ed.2d at 742.

Thus, the Supreme Court established a two prong test of agency. First, the third party must be performing "operational activities," and secondly, that party must be "under contract." [5]

Plaintiff points out that "under the terms of the charter agreement" defendant assumed liability for any "wharfage"

---

4. *Hopson* arose in the following factual context. Two seamen became ill in a foreign port and were unable to continue the voyage. Federal law requires that such incapacitated seamen be taken to a United States Consul where their return to the United States could be arranged. Accordingly, the ship's master hailed a taxi cab to transport the ill seamen, but en route to the Consul's office one was killed and the other seriously injured. The district court determined that Texaco was liable for the negligence of the taxi driver, but the court of appeals reversed. The Supreme Court agreed with the district court.

5. In *Carter*, the Third Circuit emphasized both the contractual relationship between Union Railroad and General Motors and the fact that the parking lot aided in the operational activities of the railroad.

not paid by the charterer. "Wharfage" is the fee charged the owner of a ship for the use of the dock. This would seem to indicate that the pier owner and defendant had a contractual relationship. But as it stands, the record does not adequately establish this fact.

■ Plaintiff also asserts that by providing the sole means for the crew to leave the vessel and return, the Port of Amsterdam performed an "operational activity" for the defendant. As the Supreme Court stated in Aguilar v. Standard Oil Company of New Jersey, supra:

"Men cannot live for long cooped up aboard ship without substantial impairment of their efficiency, if not also serious danger to discipline. Relaxation beyond the confines of the ship is necessary if the work is to go on, more so that it may move smoothly. No master would take a crew to sea if he could not grant shore leave, and no crew would be taken if it could never obtain it. Even more for the seaman than for the landsman, therefore, 'the superfluous is the necessary * * * to make life livable' and to get work done. In short, shore leave is an elemental necessity in the sailing of ships, a *part of the business* as old as the art, not merely a personal diversion. * * *

The voyage creates not only the need for relaxation ashore, but the necessity that it be satisfied in distant and unfamiliar ports." (emphasis added) 318 U.S. at 733–734, 63 S.Ct. at 935, 87 L.Ed. at 1116.

Although narrowly read, *Aguilar* stands for the proposition that shore activities fall within a seaman's course of employment, plaintiff seeks to apply the broad rationale of the case so that any act which enables the seaman to enjoy shore leave constitutes an "operational activity." Considering the instruction

of the Supreme Court in *Hopson* to give the term "agency" an "accommodating scope," we think that such a rule has merit. At the same time, it should be understood that a contractual relationship must exist between the owner or his agent and the negligent party to establish liability under the Jones Act. Thus, an owner does not assume liability for all acts of negligence toward the seaman on shore leave, rather only the acts of those with whom the owner has contracted to provide some product or service that enables the seaman to get ashore.

■ We hold, therefore that providing a means of ingress and egress from the SS Commander to shore constitutes an "operational activity" of the defendant, and if there is a contractual relationship between the Port and the defendant, then the jury could find that an agency relationship is established. See Carter v. Union Railroad, supra.

■■ As owner of the pier, the Port of Amsterdam owed a duty to use reasonable care to insure that plaintiff would not injure himself while walking over it.[6] Although such a duty exists, it is by no means clear that it has been violated in this case. The Port of Amsterdam may have exercised reasonable care under the circumstances which included an intermittent rain and snow. And if the Port was not negligent, then regardless of the agency issue, the defendant is not liable either. But that is undoubtedly a question for the jury to decide at trial. Consequently, summary judgment on this theory of liability must be denied.

B. NEGLIGENCE OF THE DEFENDANT IN PERFORMING A NON-DELEGABLE DUTY

■ Aside from the alleged negligence of the pier owner for which the shipowner may be responsible, plaintiff

6. Recognizing this duty and the fact that personal injury occurred, one asks what remedy a "railroad employee would enjoy under similar circumstances." The answer follows that the FELA would permit him to recover from his employer if the negligent party were his employer's agent. Consequently, a seaman has the same remedy. See Section IB, *infra*, particularly the *Cortes* case.

asserts that the defendant violated its non-delegable duty to exercise reasonable care to furnish him with a safe place to work. Clearly, the law imposes such a duty upon all shipowners. See, e. g., West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959). Nevertheless, defendant argues that under the circumstances it owed no such duty to the plaintiff because his injury occurred approximately 250 to 300 feet from the vessel in an area on the dock over which defendant exercised no control.

To support this contention, defendant cites Paul v. United States, 205 F.2d 38 (3rd Cir. 1952), cert. denied, 346 U.S. 888, 74 S.Ct. 140, 98 L.Ed. 392. The Paul case involved an action by a seaman against a shipowner for personal injuries sustained as a result of a fall into a pit on a pier some 100 feet from the ship. As in this case, the shipowner had no right of control over the area. At the outset of its opinion, the court set forth the issues to be decided in the case:

"Other than in the immediate vicinity of a vessel's gangplank is a shipowner under a duty to provide safe means of passage from or to the vessel over a dock area over which the shipowner has no control and/or to inspect and give warning of the conditions prevailing along the dock's passageway?" 205 F.2d at 38.

After a review of the authority, the majority expressly held that the shipowner did not owe a duty to provide a safe means of passage over the pier or to inspect it and give warning of the dock's conditions. Chief Judge Biggs dissented vigorously:

"The shipowner did not have control of the dock but I cannot bring myself to the conclusion that the master of the 'Moultrie' did not have a duty to the libellant, as a ward of the admiralty, to exercise reasonable diligence to make sure that the walkway, the customary way of egress from the vessel

to the shore, was safe. If the master had exercised even slight care he would have been aware of the defect and could have warned Paul of the danger.

The pit in which Paul fell was within one hundred feet of the bow of the vessel, unguarded and unlighted. The accident occurred at night. Though Paul was going on shore leave he nonetheless was in the course of his employment. * * * Since the ship's master did not fulfill what I think was his duty to the seaman I conclude that the United States should be liable to him for damages. * * * Negligence within the purview of the Jones Act is to be construed liberally, bearing in mind that the obligation of a shipowner to his seamen is greater than that of the ordinary employer to his employees." 205 F.2d at 43.

See also, Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949), rehearing denied 338 U.S. 839, 70 S.Ct. 32, 94 L.Ed. 513. Despite the persuasiveness of this dissent, the Third Circuit has not yet expressly departed from the rules of law applicable to seamen which were established by the Paul case. Indeed, as recently as 1963, in Hagans v. Ellerman & Bucknall Steamship Company, 318 F.2d 563, 579 (3rd Cir. 1963) the circuit court reiterated that "[the shipowner] is not chargeable with the non-delegable duty of furnishing a safe place to work [on the dock], a location over which it [has no control or right of control]."

Other courts, particularly in the Second Circuit have followed this view. Most recently, in Dangovich v. Isthmian Lines, Inc., 327 F.2d 355 (2nd Cir. 1964), aff'g 218 F.Supp. 235 (S.D.N.Y. 1963) the Second Circuit affirmed a lower court opinion which denied relief under the Jones Act to a seaman who was injured while walking across a railroad trestle en route to his ship.[7] The lower court cited Paul for its conclusion

---

7. The opinion is not clear as to whether the trestle was located on the deck itself.

In any case, his fall occurred near the vessel.

that the shipowner had no duty to provide the plaintiff with a safe means of egress or access to the ship beyond the gangway or to inspect and warn of dangerous conditions beyond that point. Likewise, in Wheeler v. West India SS Co., 205 F.2d 354 (2nd Cir. 1953), aff'g 103 F.Supp. 631 (S.D.N.Y. 1951), cert. denied, 346 U.S. 889, 74 S.Ct. 141, 98 L.Ed. 393, the Circuit Court affirmed another lower court opinion which espoused rules of law identical with those established by the *Paul* decision.[8]

Plaintiff argues that the *Paul* case has been overruled *sub silentio* by the Third Circuit's alternative holding in Carter v. Union Railroad, supra, and the Supreme Court's decision in Shenker v. Baltimore & Ohio R. Co., 374 U.S. 1, 83 S.Ct. 1667, 10 L.Ed.2d 709 (1963).

The part of the Carter decision relied upon by the plaintiff held that:

"The FELA imposes upon the employer a nondelegable duty to use reasonable care to furnish his employees a safe place to work (citation omitted), and this duty extends beyond its premises and to property which third persons have a primary obligation to maintain. (Citing Shenker v. Baltimore & Ohio R.R. Co., supra. Other citations omitted). This duty includes a responsibility to inspect the third party's property for hazards and to take precautions to protect the employer from possible defects, and is separate and distinct from any negligence that may be attributable to General Motors. (Citing Shenker v. Baltimore & Ohio R.R., supra. Other citations omitted)." 438 F.2d at 210–211.

And the court imposed this duty even though "[t]he railroad exercised no control over the path, the sole responsibility for maintaining said property being General Motors'." 438 F.2d at 210.

Plaintiff argues that once the existence of a duty is established in FELA cases to provide a safe place to work even on the "premises of third persons over which the railroad exercises no control and to inspect for dangerous conditions thereon," extension of these duties to Jones Act cases logically follows.

Defendant asserts that this court is constrained to hold otherwise by the Supreme Court's decision in Cortes v. Baltimore Insular Line, 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368 (1932). In that case, a seaman died allegedly as a result of the failure of the ship's master to give him proper care after he fell ill with pneumonia on the voyage. The defendant asserted that by terms of the Jones Act, the duties owed to railroad employees carried over to seamen; and since a railroad owner owed no duty to give maintenance or cure to a sick person, the defendant shipowner owed no such obligation either. Justice Cardozo, recognizing the possibility of a bad result, rejected defendant's interpretation of the Jones Act.

"The act for the protection of railroad employees [FELA] does not define negligence. It leaves that definition to be filled in by the general rules of law applicable to the conditions in which a casualty occurs. * * * Congress did not mean that the standards of legal duty must be the same by land and sea. Congress meant no more than this, that the duty must be legal, i. e., imposed by law; that it shall have been imposed for the benefit of the seaman, and for the promotion of his health or safety; and that the negligent omission to fulfill it shall have resulted in damage to his person. When this concurrence of duty, of negligence and of personal injury is made out, *the seaman's remedy is to be the same as if a like duty*

---

8. Other cases supporting the *Paul* case's holding are: D'Costa v. U.S. Lines Co., 227 F.Supp. 180 (S.D.N.Y.1964); Martinez v. S.S. Hawaiian Retailer, 1963 A.M.C. 1188 (S.D.Ga.1963); and Jacobson v. Columbia Hudson Lumber Co., 1959 A.M.C. 468 (Cir.Ct.Or.1958). At least two courts have questioned the result. See Bradshaw v. The Carol Ann, 163 F.Supp. 366 (S.D.Tex.1956); Williamson v. Western-Pacific Dredging Corp., 304 F.Supp. 509 (D.Or.1969).

*had been imposed by law upon carriers by rail"* (emphasis supplied.) 287 U.S. at 377–378, 53 S.Ct. at 176, 77 L.Ed. at 372.

Defendant cites this case for the proposition that the existence of a duty in the owner and the corresponding right in the seaman does not depend on the state of the law under the FELA, e. g., under the *Carter* and *Shenker* decisions. We disagree with this interpretation of *Cortes.*

In order to effectuate the Act's remedial purpose, the unanimous Court in *Cortes* held that the duties owed by a railroad to its employees under the FELA do not constitute the complete spectrum of duties owed by a shipowner to a seaman under the Jones Act. Consequently, a seaman's right to cure and maintenance which he had enjoyed prior to the passage of the Act was not taken away by the new statute.

■ But the question presented in this case is not whether seamen possess rights *in addition* to those enjoyed by railroad employees (*Cortes* settled that issue), but rather whether seamen *at least* enjoy all of the rights and remedies extended to railroad employees under the Federal Employers' Liability Act. The language of the Jones Act itself could not be any clearer on this point.

" * * * all statutes of the United States modifying or extending the *common-law right or remedy* in cases of personal injury to railway employees shall apply [to seamen]." [9] (emphasis supplied).

Thus, consistently with *Cortes* and the statute itself, it is apparent that (1) all rights or remedies extended to railroad employees apply to seamen, but the converse is not necessarily true and (2) these are not the seaman's exclusive rights or remedies, but they are in addition to any others he might enjoy by virtue of the peculiarities of his job.

For these reasons, we are satisfied that the rules fashioned in *Carter* and *Shenker* apply to seamen, and these cases have overruled the *Paul* decision *sub silentio.*

By a different tack, it is also apparent that the reasoning of the *Paul* decision no longer retains any vitality in this Circuit. The foundation of the *Paul* case rests upon the proposition that a shipowner's responsibility does not extend *beyond the physical confines of the ship* to a location over which it has *no control.* In a related area involving the doctrine of unseaworthiness, both Supreme Court and Third Circuit cases decided after *Paul* indicate that these factors are no longer determinative.

In Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954) the Supreme Court affirmed a decision from the Ninth Circuit which expressly rejected the "relinquishment of control" rule which had been adopted by the Third and Second Circuits as a limitation upon the scope of the doctrine of unseaworthiness. Plaintiff, a longshoreman, suffered personal injuries while loading cargo onto the ship when a block, brought on board by a stevedoring company, his employer, broke. At the time of the accident, plaintiff was working on board the ship. The Circuit Court held that a shipowner could not escape liability for unseaworthiness either because control of that part of the ship where the unseaworthy condition occurred was surrendered to the stevedores or because the defective item was owned by a third party. 205 F.2d 478 (9th Cir. 1953).[10]

This doctrine was extended by the Court in Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963). In that case, the injuries occurred off the ship when the plaintiff, also a longshoreman, slipped on the dock on beans which had been spilled out of defective bags during the

---

9. 46 U.S.C. § 688.

10. See also, Rogers v. United States Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120 (1954).

unloading process. On these facts the Court held that "the duty to provide a seaworthy ship and gear, including cargo containers, applies to longshoremen unloading the ship *whether they are standing aboard ship or on the pier.*" 373 U.S. at 215, 83 S.Ct. at 1191, 10 L.Ed.2d 297 (emphasis supplied).[11]

The Third Circuit in Spann v. Lauritzen, 344 F.2d 204 (3rd Cir. 1965) faced the issue of unseaworthiness in an even more difficult factual context. There the injured longshoreman was operating a hopper on shore into which nitrate from the ship's hold was dumped by means of a shore based crane with a bucket on it. Plaintiff's job entailed opening the floor of the hopper to let the nitrate which had been discharged into it run out and into a truck waiting below to be filled. This he accomplished by pulling down on a heavy horizontal bar. Plaintiff suffered personal injuries when a bucket load of nitrate was dropped into the empty hopper and caused a sudden downward movement of the handle which struck him. He asserted that this was caused by a defective release mechanism on the hopper. The Circuit Court found that the plaintiff had a cause of action based upon unseaworthiness even though the accident occurred off the ship in an area over which the owner exercised no control because (1) plaintiff was engaged in the *service of the vessel* and (2) the large shore based hopper had *sufficient connection with the ship* to be within the subject matter of that doctrine. Similarly, in Byrd v. American Export Isbrandtsen Lines, Inc., 300 F.Supp. 1207 (E.D.Pa.1969) the court held that the owner's duty extended to a longshoreman who was injured while attempting to move a forklift truck *"from the back to the front of the pier"* for loading aboard defendant's vessel as cargo. And finally, in Law v. Victory Carriers, Inc., 432 F.2d 376 (5th Cir. 1970), cert. granted, 401 U.S. 936, 91 S.Ct. 937, 28 L.Ed.2d 215

(1971), the court held that a longshoreman who was injured approximately 50 feet from the vessel on the pier while carrying cargo on a defective forklift machine was entitled to the protection of the unseaworthiness doctrine.

■ The crucial point in these cases is that application of the doctrine of unseaworthiness of vessel does not turn on whether the accident occurs on the ship or in an area over which the owner exercises control. Rather, the connection of the activity involved with the business of the ship is determinative.

While the scope of the owner's duties under the Jones Act for negligence and under general maritime law for unseaworthiness of the vessel are not congruent, undoubtedly the scope of duties under the former Act *exceeds* the scope of duties under the latter principle. By definition, the Jones Act applies in part to negligent acts which occur on the vessel, and the doctrine of unseaworthiness of the vessel determines in part the actual parameters of the vessel itself. Consequently, if the doctrine of unseaworthiness of the vessel gives rise to a duty in a particular factual context (e. g., in an uncontrolled area off the ship), then the Jones Act also applies and extends a duty (*albeit* a different duty) *at least* to the same physical location.

■ From this reasoning, it follows that the test to determine the scope of an owner's duty under the Jones Act must be *at least* as accommodating as the test under the unseaworthiness concept. Thus, for purposes of determining the scope of duties under the Jones Act, it is essential to reject immediately any factors which have already been rejected under the unseaworthiness doctrine. Otherwise, one runs the risk of saying that the Jones Act does not extend duties to a physical area which has been determined to be *part of the vessel itself* and covered by the unseaworthiness doctrine. Hence, under the Jones

---

11. See also, Thompson v. Calmar Steamship Corporation, 331 F.2d 657 (3rd Cir. 1964), cert. denied, 379 U.S. 913, 85 S.Ct. 259, 13 L.Ed.2d 184; Hagans v. Ellerman & Bucknall Steamship Co., 318 F.2d 563 (3rd Cir. 1963).

Act, the absence of control and the fact that the accident occurred on shore some 250 to 300 feet from the vessel cannot be determinative.

■■■■■ Considering this line of cases as well as the decisions in *Carter* and *Shenker* under the Federal Employers' Liability Act, we conclude that the rule envisioned by Judge Biggs in *Paul* is the one which the Third Circuit would adopt today. We hold, therefore, that a shipowner has a non-delegable duty to furnish plaintiff with a safe means of ingress and egress from his place of employment and that the scope of this duty extends to the dock at which the ship is berthed. Moreover, the shipowner has a duty to use reasonable care to inspect the pier for hazards and take reasonable precautions to protect crew members from any possible defects.[12]

In so holding, we are particularly mindful of the Supreme Court's instruction that "[t]he act is to be liberally construed in aid of its beneficent purpose to give protection to the seamen and those dependent on his earnings." Cortes v. Baltimore Insular Line, 287 U.S. at 375, 53 S.Ct. at 176, 77 L.Ed. at 372.[13]

We think Judge Sobeloff eloquently and accurately expressed part of the rationale behind a liberal construction of the Jones Act when he stated:

"It is more consonant with justice and the spirit of the Jones Act for the shipowner to be held to its statutory obligation in the present action and then for it to bring suit as subrogee against Abhiram in Trinidad where the shipowner does business regularly, than to remit the plaintiffs [seamen] to their remedy against Abhiram in distant Trinidad." Hopson v. Texaco,

Inc., 351 F.2d 415 (4th Cir. 1965) (dissenting opinion), rev'd, 383 U.S. 262, 86 S.Ct. 765, 15 L.Ed.2d 740 (1966).

Without such recourse, practically speaking, the seaman has no remedy at all. As indicated above, Congress intended to benefit seamen by passing the Act, it did not intend to enact a nugatory remedy.

Since the jury must decide (1) whether defendant used reasonable care to furnish a safe means of ingress and egress in this case and (2) whether the defendant used reasonable care to inspect the pier and correct or warn of any possible dangers, summary judgment for the Jones Act claim based on defendant's negligence also must be denied.

## II. UNSEAWORTHINESS OF THE VESSEL

■■■■ In addition to the loading and unloading processes with which all of the cases cited in Section IB dealt, the doctrine of unseaworthiness of the vessel also extends to an appurtenance to the ship. Cf., Morales v. City of Galveston, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962). To decide whether an area constitutes an appurtenance to the ship, one does not ask whether the owner controls the location or whether the place is on board, rather under *Spann* the tests are (1) whether the plaintiff is engaged in the service of the ship and (2) whether the pier has sufficient connection with the ship to be within the subject matter of the unseaworthiness doctrine. Without actually deciding whether the pier constitutes an appurtenance, we point out that because it facilitates the business of the ship both in permitting the discharge of cargo as well as permitting

---

12. We need not and do not decide whether this duty extends beyond the pier.

13. See Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949), rehearing denied, 338 U.S. 839, 70 S.Ct. 32, 94 L.Ed. 513; Garrett v. Moore-McCormack Co., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942); Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265 (1939); Cox v. Roth, 348 U.S. 207, 75 S.Ct. 242, 99 L.Ed. 260 (1954); The Arizona v. Anelich, 298 U.S. 110, 56 S.Ct. 707, 80 L.Ed. 1075 (1936), rehearing denied, 298 U.S. 692, 56 S.Ct. 945, 80 L.Ed. 1409. See generally, G. Gardener, Remedies for Personal Injuries to Seamen, Railroad and Longshoremen, 71 Harv.L.Rev. 438 (1959).

the crew to get ashore, such a conclusion at least has plausibility.

Nevertheless, this is an exceedingly close case, and to label a pier an appurtenance to the ship would significantly expand the doctrine. Because the Supreme Court has granted certiorari in Law v. Victory Carriers, Inc., *supra*, we prefer to await that decision which may sharpen the definition of unseaworthiness before facing this issue.[14] Consequently, we will allow the question to go to the jury in the form of a separate interrogatory, and if necessary, we will rule on the issue in a motion for judgment n. o. v. This decision in no way prejudices the defendant since in any event he must go to trial on the issue of liability under the Jones Act, and the evidence to defend against either claim is practically the same.

See also D.C., 313 F.Supp. 377.

14. This conclusion has no effect on our discussion in Section IB because regardless of the final test, the Supreme Court has already *rejected* control and whether the accident occurred on board or ashore as non-crucial factors.